GATE CITY NATIONAL BANK, Appellant, v. E. A. BUNTON et al. —296 S. W. 375.

Division One, April 11, 1927.

1. **EVIDENCE: Contradictory Extra-Judicial Statements.** Evidence tending to show that defendants had previously made statements inconsistent with their testimony at the trial, and tending further to show that their defense was an afterthought, merely go to their credibility as witnesses.

2. **NEGOTIABLE NOTE: Liability of Indorser: Obtained by Fraud of Maker: Negligence.** Notwithstanding the accommodation indorser signed the note for $25,000 sued on, if he was requested by the maker to sign a note, and the maker showed him a $5,000 note and he read it and intended to indorse only that note, but the maker by some trick or fraud, and without the knowledge of the indorser, substituted the note for $25,000 sued on, and the indorser, thereby deceived and misled, while intending and believing that he was indorsing the $5,000 note, indorsed the $25,000 note, and in his conduct leading up to his indorsement was in the exercise of ordinary care, the indorser is not liable to the payee on such note, although the payee, for value, received the note before its maturity, without knowledge of the deception and fraud practiced upon the indorser by the maker.

3. ————: **Indorsement Obtained by Fraud: Delivery to Payee by Maker: Agency.** Where the indorsement of a negotiable note was obtained by the trick and deception of the maker, and the indorser did not knowingly or intentionally give the appearance of validity to it, the indorser did not create an agency or trust, although the maker delivered it before maturity to the payee, and the indorser understood that a note for a less amount, which he supposed he was signing, would be so delivered.

4. ————: ————: **Akin to Forgery.** Fraud in the inception of a promisory note is closely akin to forgery; so much so that it may be proved under a plea of **non est factum.** The indorsement of a negotiable note, obtained

by the fraud and deception of the maker, is no more the act of the indorser than if it had been forged.

5. ———: ———: **Negligence.** The liability of an indorser, whose indorsement of a negotiable note is obtained by the fraud and trick of the maker, without his knowledge of the fraud, arises solely from negligence. Even though the note be in the hands of a holder in due course, fraud as to the character of the instrument exonerates the indorser from liability, unless he was himself remiss in failing to discover the fraud and deception practiced upon him.

6. ———: ———: **Fraud in the Factum: Fraud in the Inducement: Distinction: Holder in Due Course.** Fraud in the factum—that is, where the signer of a negotiable note was deceived as to the character of the instrument, signed it without knowledge of its character, and was free from negligence—is available as a defense to a suit by an innocent purchaser for value; but whether the Negotiable Instrument Law does away with the common-law distinction between fraud in the **factum** and fraud in the inducement, or binds the indorser in a suit by a holder in due course in case the fraud is in the inducement, need not be decided in a case in which the plaintiff is not a holder in due course.

7. ———: **Payee: Holder in Due Course.** Under the Negotiable Instrument Law the payee of a negotiable promissory note is not a holder in due course.

8. ———: **In Hands of Payee: Defenses: Fraud as to Character.** A negotiable note in the hands of the payee is subject to the same defenses that would be available were it non-negotiable. The provisions of the Negotiable Instrument Law are not determinative of the right and liabilities of the parties in a suit brought by the payee of a negotiable note against an accommodation indorser whose indorsement was procured by the fraud and trick of the maker, and who was thereby deceived as to the character of the instrument and signed without knowledge of it.

9. ———: **Collateral Security: Conversion: Prejudicial Examination.** Where the note sued on had been secured, in addition to defendants' indorsements, by a pledge of collateral notes of an equal amount, and the defendant indorsers had pleaded conversion, and such plea was not challenged by demurrer or otherwise, and it developed upon cross-examination of plaintiff's witnesses that plaintiff had sold the collateral notes and bought them for a small amount which was credited on the note, and being advised that the sale was void erased the credit and restored the collateral to a status of a pledge, the cross-examination of said witnesses with respect thereto was not prejudicial on the theory that the matters touching the sale constituted no defense, but as they had been pleaded as a defense and the plea went unchallenged the examination was relevant.

10. **NEW TRIAL: Prejudicial Account in Newspaper: Read by Jurors: Waiver.** The reading by the jury of prejudicial statements in a newspaper is waived if the losing party discovers it in ample time before the case is submitted to the jury and brings it forward for the first time in his motion for a new trial. The defense to plaintiff's suit on a note was that the defendants had been induced to indorse it by the trick and deception of the maker. During the progress of the trial and before the case was submitted to the jury, plaintiff's counsel, at the noon recess, found in the jury room a newspaper, which displayed upon the front page, under prominent headlines, a news item to the effect that three criminal causes then pending against said maker would be continued on account of his illness. Immediately the attorney took the paper to the trial judge, advised him that he had found it in the jury room, and stated that said article had evidently been read by members of the jury. But he did nothing more; he did not ask that

the jury be admonished or discharged; he permitted the trial to proceed and culminate in an adverse verdict, without voicing a protest, and then brought forward the matter in his motion as a ground for a new trial. **Held,** that the assignment came too late, and was waived.

**11. ARGUMENT TO JURY: Review.** The question whether the argument of respondent's counsel to the jury was improper is not for consideration on appeal, where at the trial appellant's counsel objected to the argument, and the court ruled that some parts of it were improper, and no further objection was made, and no exception was saved.

---

Corpus Juris-Cyc. References: **Appeal and Error,** 3 C. J., Section 810, p. 910, n. 82; 4 C. J., Section 2973, p. 990, n. 25. **Bills and Notes,** 8 C. J., Section 686, p. 469, n. 47; Section 1004, p. 717, n. 3; Section 1049, p. 791, n. 3; p. 792, n. 9; Section 1260, p. 963, n. 63; Section 1382, p. 1066, n. 11; Section 1395, p. 1074, n. 9; Section 1399, p. 1080, n. 74. **New Trial,** 29 Cyc., p. 813, n. 94.

Appeal from Worth Circuit Court.—*Hon. John M. Dawson,* Judge.

AFFIRMED.

*Harding, Murphy & Tucker* and *Du Bois & Miller* for appellant.

(1) Appellant's Instruction ''A'' should have been given. Appellant is the payee of the note and took it for full face value without notice of any alleged infirmity. Respondents endorsed the note understanding that it was for the purpose of procuring money from appellant. They delivered it to Bunton for the purpose of doing what they intended to get money on the note from appellant. They cannot set up the defense that they were defrauded by Bunton, the person in whom they confided to consummate the deal. This is true as to original payee. It is true as to non-negotiable notes. It is the principle, not the form of the instrument, that controls. Havilin v. Bank, 253 Mo. 300; Evans v. Company, 65 Ark. 209; Potts v. First State Bank, 151 Pac. 860; Anderson v. Warne, 71 Ill. 20; Kulenkamp v. Groff, 71 Mich. 675; Bedell v. Herring, 11 Am. St. 309, 315. (2) Instruction ''A'' should have been given for the additional reason that the acts of respondents in endorsing the note for Bunton, the principal maker, for the purpose of procuring money from appellant and placing the note in his hands to carry out the plan, constituted a request to appellant to advance the money on the note, and they are estopped from complaining of the acts of the agent in whom they confided. Watkins Med. Co. v. Warren, 150 Ark. 542; Jordan v. Jordan, 10 Lea (Tenn.) 124; Bedell v. Herring, 11 Am. St. 314. (3) Instruction ''A'' should have been given for the further reason that even if fraud had been perpetrated by Bunton as claimed by respondents, it was their conduct that rendered it possible. Even if they had been without negligence in endorsing the note at his request, they delivered it to him to be carried to and cashed by appellant, and where one of two innocent parties must suffer by the act

of a third, he whose act has enabled such third person to cause the lost must sustain it. Whittemore v. Obear, 58 Mo. 280; State to use v. Potter, 63 Mo. 212; Tiedeman on Commercial Paper, sec. 286, p. 481; Scotland County National Bank v. O'Connel, 23 Mo. App. 165. (4) The court erred in refusing appellant's Instruction "A" and in giving respondents' Instructions 1, 2 and 3, for all of the reasons set forth above, and for the further reason that respondents admit that they had the note in their hands when they signed it and that they could have read it, but neglected to do so. They were in possession of their faculties, experienced business men, used to borrowing money and signing notes and making financial statements. Their conduct amounted to such negligence as prohibited a recovery and the question of their negligence should not have been submitted to the jury. It was their duty to examine and read the document they signed. It was their duty to protect themselves against mistakes and frauds when starting a negotiable paper out into the commercial world. They cannot ignore that duty and rely upon a court to constitute itself a guardian for them and let the burden of their negligence fall upon innocent persons who relied upon the verity of the instrument. Shirts v. Overjohn, 60 Mo. 305; Bank v. Hall, 129 Mo. App. 286; New Madrid Banking Co. v. Poplin, 129 Mo. App. 121; Cannon v. Moore, 17 Mo. 92; 1 Daniel on Negotiable Instruments (6 Ed.) sec. 850, p. 1026; Bank v. Jones, 22 W. Va. 520; First Nat. Bank v. Stanley, 46 Mo. App. 440; Fayette Co. Savings Bank v. Steffes, 54 Iowa, 214; Ex parte Goldberg v. Lewis, 191 Ala. 356; 1 Brandt on Suretyship & Guaranty, sec. 456, p. 857; Jones v. Primm, 6 Tex. 170; Bank v. Baker, 193 S. W. 632. (5) The court erred in permitting respondents, over the objections of appellant, to examine witnesses touching the foreclosure of the collateral notes. They had no interest in the collateral until they discharged their duty in paying the note. It constituted no defense and was prejudicial to appellant. Maffat v. Greene, 149 Mo. 48; Stroud v. Am. Nat. Bank, 158 Ark. 509. (6) The court erred by overruling appellant's motion for new trial: (a) Because of improper and prejudicial remarks made in the argument of counsel for respondents; (b) Because a copy of a newspaper containing large head lines touching the criminal cases of Bunton was left in the jury room, on the table in plain sight, and accessible to the jury, while the case was being tried.

*Charles H. Mayer, Ed. Kelso* and *Edward G. Robison* for respondents.

(1) The defense of fraud, deception, trickery and substitution of the $25,000 note in the place of the $5000 note that the defendants read, by E. A. Bunton, is a valid defense in this action as against this

plaintiff. 8 C. J. p. 790, sec. 1049; 13 C. J. 373, sec. 252; 1 Joyce on Defenses to Commercial Paper (2 Ed.) secs. 96, 98, 220; Brannan's Negotiable Instrument Law (3 Ed.) p. 186, sec. 55; Wright v. McPike, 70 Mo. 179; Broyles v. Absher, 107 Mo. App. 177; Kingmann & Co. v. Shawley, 61 Mo. App. 60; Bank v. Hall, 129 Mo. App. 291; Loveland v. Arnold, 261 S. W. 742; Woehner v. Casket Co., 196 S. W. 385; Banking Co. v. Poplin, 129 Mo. App. 123; Frederick v. Clemens, 60 Mo. 315; Atkinson v. Kelly, 214 S. W. 279; First Nat. Bank v. Wade, 111 Pac. (Okla.) 205; German-Amer. Nat. Bank v. Kelly, 166 N. W. (Ia.) 1053; Stevens v. Largerquist, 210 Ill. App. 496; Lundean v. Hamilton, 169 N. W. (Ia.) 208; Vogel v. Pyne, 189 N. Y. Supp. 285; Auten v. Gruner, 90 Ill. 300. (2) The plaintiff is not a holder in due course or a bona-fide holder of the note in suit, but is one of the original parties to the note, that is payee, and all or any of defenses of the makers and endorsers on note in suit can be set up against the plaintiff in this suit. Sec. 838, R. S. 1919; St. Charles Saving Bank v. Edwards, 147 S. W. 980; Long v. Shafer, 171 S. W. 692; Long v. Mason, 200 S. W. 1065; also authorities cited above. Whether or not the defendants were negligent in signing their names on the back of the note is a question of fact to be determined by the jury under proper instructions. 8 C. J. 793; 8 C. J. 1065, sec. 1382; 2 Abbotts Trial Evidence (3 Ed.) p. 1555; Abbotts Civil Jury Trials (4 Ed.) p. 549; Frederick v. Clemens, 60 Mo. 315; Biggs v. Ewart, 51 Mo. 249; Woehner v. Casket Co., 196 S. W. 385; Stewart v. Andes, 110 Mo. App. 246; Bank v. Redfern, 141 Mo. App. 390; 26 R. C. L. 1067, sec. 75. The court properly refused appellant's Instruction A and correctly declared the law in respondent's Instructions 1, 2 and 3. (3) Appellant complains of the admission of evidence concerning the sale of the collateral notes. This was proper under the answer, but the evidence failing to show an improper sale the court by Instruction 8 withdrew this from the jury. There could be no error in this, and even if the evidence had been improper it would be no error. Wright v. Gillespie & Co., 43 Mo. App. 247; Stauffer v. Mt. St. Ry. Co., 147 S. W. 1036.

RAGLAND, J.—This case comes to the writer for opinion on reassignment. It is a suit by the payee of a promissory note against the maker and accommodation endorsers. The maker and three of the five endorsers suffered judgment by default. This controversy is between the payee and the remaining endorsers, O. W. Moorman and I. M. Taylor.

The evidence and the instructions to the jury were well within the issues made by the pleadings. As no question is raised with respect to the pleadings they will not be further noticed.

As stated by appellant's counsel, the following facts were disclosed by the evidence at the trial:

"W. B. Planck is and was president of the Gate City National Bank, appellant. E. A. Bunton was president of the Exchange Bank of DeKalb County. On the 23d day of September, 1922, Mr. Bunton applied to Mr. Planck for a $25,000 loan, stating that the reserves of his bank were running low and he needed that amount. He offered his own note, which he stated would be endorsed by respondents, Moorman and Taylor and also by his wife, A. D. Bunton, Thomas G. Riffie and Alfred Kelley. He also offered collateral security in the way of customers' notes from the Exchange Bank in the sum of $25,000. He presented to Mr. Planck his financial statements of respondent Taylor and of all the other endorsers, with the exception of respondent Moorman, which he promised to furnish. This was Saturday. The discount board met at the noon hour, approved the loan to the Exchange Bank on the conditions named. Mr. Planck called his stenographer, Mrs. Smith, filled out on the regular blank a $25,000 note and delivered it to Mr. Bunton to be executed and returned, together with the financial statement of Moorman as promised. Mr. Bunton left the bank with the note at two o'clock.

"On Monday, September 25, 1922, Mr. Bunton wrote a letter to Mr. Planck enclosing the note endorsed agreeably to arrangements, by Moorman, Taylor, A. D. Bunton, Riffie and Kelley; also the financial statement of Moorman. He had left with Mr. Planck on Saturday before the $25,000 of collateral notes. In his letter he requested that credit be given to the Exchange Bank for the face of the note, less proper discount, which was done, and which amount was subsequently checked out in due course by the Exchange Bank.

"Moorman's financial statement bore the same date as the $25,000 note—September 23, 1922. It showed that he had a total worth of $157,280 and a net worth of $105,480.

"Taylor's financial statement was dated February 27, 1922. It showed that he had total assets amounting to $203,000, and a net worth of $170,737.

"The $25,000 note sued on was on the regular printed form of the Gate City National Bank; and when it was returned, together with the financial statement of Mr. Moorman, it was in the same condition as when delivered to Bunton, the Saturday before, with the exception of the endorsements and signatures.

"In December following, the Exchange Bank failed."

On behalf of himself, defendant Moorman testified in part as follows:

"I have lived in DeKalb County for forty-nine years and am fifty-two years old. I operate a little over eight hundred acres, and am stock-raising. I first knew E. A. Bunton when he was county treasurer and

afterwards he became a banker. He ran the Exchange Bank of DeKalb County. I have been doing business with him ever since I have been doing business for myself, and even before that. I did some business with him while I was living with my father. I have done business with him for thirty years. I have borrowed money from his bank and kept my money there. I signed the note sued on.

"I went into the bank one afternoon just about four o'clock to transact a little business. I was standing in the position I am sitting, facing north, and Mr. Bunton had a little office to the northeast of where I was standing, and he came out of there, and as I turned to leave, he said, 'Oscar, I would like to get you to endorse a little note for me. A little note—I would like to get you to endorse a little note,'' just the words he used, and he said, 'How about it?' I said, 'Let me see the note.' I just hesitated a little, and said, 'Well, let me see the note,' and he went back to his desk somewhere and secured the note, and I was standing then at the little gate that enters his little corner, and he showed it to me, and I read the note. It was for $5,000, made payable to the Gate City National Bank, signed by E. A. Bunton, I said, 'That will be all right.' He said, 'Come in, then,' and we went in that little office and he fussed around over on his desk and got a pen and dipped it in the ink, and laid the papers down there. He didn't sit down, nor did I sit down, and he just laid it on the corner of the desk, and I signed it right there, and I turned and left the bank.

"Q. Now, at the time you signed your name on the paper that he turned over for you did you believe it was a note for $5,000, or what did you believe it was? A. I read it. It was a note for $5,000.

"Q. Did you know you were signing a note for $25,000? A. I knew that I was not.

"Q. Did you intend to sign a note for $25,000? A. I did not.

"Q. Would you have signed a note for $25,000? A. I certainly would not."

On cross-examination he further testified:

"Q. So that you did actually read this note? A. I read the note, the face of the note, so that I knew what was in it, what it was.

"Q. Now after you read the note—Mr. Bunton gave it to you when you read it, is that right? A. That is right.

"Q. Did you give it back to him? A. I did.

"Q. Then you went over to his desk, is that right? A. Yes.

"Q. And you came in through the gate? A. You come into the gate first.

"Q. You were through the gate when you looked at the note? A. No.

"Q. You had come in through the gate when you looked at the note? A. No, I looked at the note in the corridor.

"Q. And then you came in? A. I followed him—I returned the paper to him and followed him into the little office.

"Q. And that is out in front of the bank, isn't it, just separated from the lobby or corridor, as you say, by a railing? A. Yes.

"Q. You went right back with Bunton, when he went back there? A. Yes.

"Q. And he laid the note down on the table and said, 'Sign'? A. He fussed around and got the pen and ink and held the note in his hand.

"Q. From the time you handed it to him? A. Yes.

"Q. Then you didn't see the note after you handed it back to him; you didn't see the note out of his hand while he was fussing around for the pen and ink? A. No.

"Q. Then you saw him lay the note on the table? A. Yes.

"Q. And he said, 'Sign here'; it wasn't folded in that way? A. No, he didn't say, 'Sign here'; he says, 'You see I have already—' He made the remark, 'You have seen that I have already signed it,' and I just put my signature on it.

"Q. Did he lay it down this way? A. Yes, he laid it back side up.

"Q. And you put your signature on the top, 'O. W. Moorman?' A. Yes.

"Q. And the same paper you put your signature to was the same paper you handed back to him? A. I thought so.

"Q. You saw it in his hand from the time you handed it to him until he put it back on the table? A. I thought so.

"Q. And this is the note that you looked at and signed, isn't it? A. I think so, yes, sir.

"Q. And after he put it on the table like this so you could sign it, you never looked at it any more at all? A. No.

"Q. You had your hand on it when you signed it? A. Yes, sir.

"Q. He didn't have his hand on it when you signed it, did he? A. No.

"Q. You had every opportunity in the world to pick it up? A. Yes, I did.

"Q. But you didn't pick it up? A. No." And on redirect examination as follows:

"Q. Well, say whether or not you saw him change notes on you in any way. A. No, I did not.

"Q. If the notes were switched from one note to the other, did you know it when you signed it? A. I did not."

Defendant Taylor for himself testified:

"I live at Maysville, Missouri. I have lived in DeKalb County fifty-four years. I was born there. I have been a farmer all of my life. I knew E. A. Bunton when he was president of the Exchange Bank, for thirty years. I signed the note sued on. Mr. Bunton asked

316 Mo.—85.

me to sign a note for him, a small note-like a $5,000 note; that was at the bank and along about the middle of September. He gave me the note which I read. It was for $5,000, and was payable to the Gate City National Bank. We were out in the lobby, behind a little railing, and he picked up the note and went back in the bank and cleared away the table for me to sign it. I did not see him change the note. At the time I signed it, I thought it was for $5,000. I first learned that I had signed a note for $25,000 a short time before the bank closed, probably December 15th."

On cross-examination he further testified:

"I signed the note sued on about 7:30 o'clock, but I do not know the day of the week.

"Q. When you signed it, were all these signatures on it, except Mr. Kelley's, or the last one there? A. Yes, sir, they were all on except Mr. Kelley's.

"Q. Mr. Moorman's signature on the top? A. Yes, sir.

"Q. And Mrs. Bunton's signature and then Mr. Riffie's and then came your signature? A. Yes, sir.

"Q. They were all there at the time you signed it? A. Yes, sir.

"Q. Was this Saturday evening that you signed this note? A. I don't remember.

"Q. Now, Mr. Bunton told you that he wanted you to sign a small note for $5,000? A. He wanted me to sign a note for $5,000?

"Q. Didn't you just say that he told you, that he said, 'I want you to sign a small note for $5,000? A. Well, he just said he wanted me to sign a small note.

"Q. $5,000 isn't a very large note? A. Well, no, it aint. . . .

"Q. Where were you when he said that he wanted—said, 'I want you to sign a small note?' A. Inside the bank.

"Q. Were you inside the railing? A. Yes, sir.

"Q. In where his desk is when he asked you that? A. Yes, sir.

"Q. He gave you the note, did he? A. Yes, sir.

"Q. Now, what kind of a note was it that he gave you? A. Well, a note about the size of that one there you have, yes, sir.

"Q. About this size? A. Yes, sir.

"Q. You read it? A. Yes, sir.

"Q. To whom was the note payable that you say you read? A. To the Gate City Bank.

"Q. Printed just like this is? A. I can't see from here.

(Thereupon counsel hands to the witness a certain paper-writing.)

"A. Yes, sir.

"Q. You read the whole note? A. I just read the body of the note.

"Q. Where was it signed? A. Where did Mr. Bunton sign it?

"Q. Yes. A. He signed it in the right-hand corner,

"Q. Did you read the description of the collateral at that time, too? A. I did not.

"Q. Did you look at that at all. A. I did not.

"Q. Did you see those figures on here? A. No, sir.

"Q. Didn't see those at all? A. No, sir.

"Q. $25,000? A. No, sir.

"Q. You didn't see those figures down here in the collateral $25,000? A. No, sir.

"Q. Where was—where were the figures written that you saw? A. In the left hand corner.

"Q. What were those figures? A. $5,000.

"Q. Was the five thousand dollars written right up close to the dollar sign? A. Well, I couldn't just say how close it was. It was right in the corner, though, in the place there for it.

"Q. Where was the words 'Five Thousand'' written? A. They was in the body of the note.

"Q. How far from the margin? A. I couldn't be positive about how far.

"Q. Were the figures that you read, 'five thousand' that you say you read in the body of the note, in longhand or typewritten? A. Typewritten.

"Q. Did the note that you read have any description of collateral at all? A. I didn't read it.

"Q. Well, you got—Did it have any matter that was typewritten? A. I don't remember.

"Q. Now, he gave you this note? A. Yes, sir.

"Q. And you read it? A. Yes, sir.

"Q. And handed it back to him? A. Yes, sir.

"Q. Did you go into another room? A. Yes, sir.

"Q. Or did he clear off the desk? A. Yes, sir.

"Q. Where was this other room in relation to the place you were in when you read the note? A. It was west of it.

"Q. In other words, you read the note outside of the railing? A. Yes, sir.

"Q. And then went inside to where his desk was? A. Yes, sir.

"Q. And he cleaned off a space to put the note down and you signed it? A. Yes, sir.

"Q. How did he put it down? A. I think it was just folded.

"Q. Tell us how it was put down without 'thinking' about it? A. He had it folded up like that.

"Q. He had it folded? A. Yes, sir.

"Q. Did you see him fold it? A. I expect I did, but I don't know as I could say positive.

"Q. You handed him the note? A. Yes, sir.

"Q. And you went right in to this desk inside of this railing? A. Yes, sir.

"Q. From the time you handed it to him until he put it down on the desk, did you see the note? A. I don't know as I did; he was a little ways ahead of me.

"Q. Where did he put it when you handed it to him? A. Taken it in his hand.

"Q. And he carried it in to the desk in his hand? A. Carried it then over to the desk and then went over to the teller's window to get pen and ink.

"Q. And he left the note on the desk? A. No, he didn't.

"Q. He carried the note with him into the teller's window and carried it back? A. Yes, sir.

"Q. So that there was some time there you didn't see him at all—couldn't see the note at all? A. Sometime I couldn't see the note at all, yes, sir.

"Q. He went into the teller's window and came back and the note was folded like that, and he put it down and you took your pen and signed it? A. Yes, sir.

"Q. Did you open it up to see what was on the back of it, on the reverse side, while you were signing it? A. No, sir.

"Q. He didn't have his hand on it while you were signing it? A. No, sir.

"Q. It would have been a very easy matter for you to have raised it up and looked on the other side of it? A. Yes, sir.

"Q. But you just signed it and he took it? A. Yes, sir."

The note in suit is on a printed form. Following the typewritten and printed matter constituting the note, and the signature of the maker, there is quite a lengthy document entitled, "Pledge of Collateral;" that was likewise in typewriting and print. Each of the defendants testified, in effect, that the note shown him was in the form just described, and each admitted that he did not read the part referring to the collateral. There was evidence on the part of the plaintiff tending to show that Moorman and Taylor had previously made statements inconsistent with their testimony on the trial, and tending further to show that their defense was an afterthought. All of these matters, however, merely went to their credibility as witnesses. Bunton was not called as a witness by either party. At the conclusion of the evidence plaintiff asked Instruction "A," as follows:

"The court instructs the jury that it is admitted in this case that defendants Moorman and Taylor endorsed the note sued on in this case. If the jury find and believe from the evidence that said defendants endorsed said note before delivery and that they knew that said note was to be used to get money from the plaintiff bank and that they entrusted said note to defendant E. A. Bunton for delivery to

plaintiff bank, and if you further believe from the evidence that said Bunton received from plaintiff bank for the use of the Exchange Bank of DeKalb County the sum of $25,000 and that plaintiff bank had no notice or knowledge as to how said defendants' signatures were ob-. tained to said note, then your verdict will be for the plaintiff and against said defendants and each of them, even though you may believe from the evidence that said defendants and each of them were induced to sign said note by fraud perpetrated by said Bunton and under the belief they were signing a $5,000 note instead of a $25,000 note.''

The instruction was refused. At the instance of defendant Moorman the court gave an instruction as follows:

''The court instructs the jury that although it is admitted in this case that the defendant O. W. Moorman's name appears on the back of the note sued on as an endorser thereof, and that defendant O. W. Moorman wrote his name thereon, nevertheless your verdict should be for the defendant O. W. Moorman if you find and believe from the evidence that the said Moorman was requested by E. A. Bunton mentioned in the evidence, to endorse a note; that said Moorman requested the said Bunton to show him the note; that the said Bunton handed a note to the said Moorman, and that the said Moorman read the note so handed to him, if you so find, and that said note was for $5,000 only, and that said Moorman attempted to and intended to endorse said $5,000 note, if you find that the said Bunton handed him a $5,000 note, and that by some trick or fraud, and without any knowl- edge on the part of said Moorman, the $25,000 note sued on was sub- stituted for the $5,000 note, if you find there was a $5,000 note, and that the said Moorman, while intending to endorse a $5,000 note, if you so find, and while believing that he was endorsing a $5,000 note, if you so find, endorsed the note sued on, and that he intended to and believed he was endorsing a note for $5,000 only, and that he did not know he was endorsing a $25,000 note, and that said Moorman, at the time he wrote his name on said $25,000 note, and in his conduct lead- ing up to the endorsing of said note, was in the exercise of ordinary care on his part.'' A similar instruction was given on behalf of de- fendant Taylor, and instructions which were the converse of each were given for plaintiff. A verdict was returned for both defendants; the case comes here on plaintiff's appeal.

Appellant's main contention is that the trial court committed error in refusing its Instruction ''A'' and in instructing the jury on the theory embodied in the instruction given for the defendant Moor- man. It also contends that it was entitled to a directed verdict under the theory of defendants' instructions, on the ground that the de- fendants were guilty of negligence as a matter of law. Certain alleged

procedural errors are also complained of; these will be dealt with after the main questions are disposed of.

I. 1. In support of its contention that plaintiff's Instruction "A" should have been given, appellant advances these propositions: (1)

**Fraud of Maker: Defense.**

"Appellant is the payee of the note and took it for full face value without notice of any alleged infirmity. Respondents endorsed the note understanding that it was for the purpose of procuring money from appellant. They delivered it to Bunton for the purpose of doing what they intended —to get money from appellant. They cannot set up the defense that they were defrauded by Bunton, the person in whom they confided to consummate the deal." (2) "The acts of respondents in endorsing the note for Bunton, the principal maker, for the purpose of procuring money from appellant and placing the note in his hands to carry out the plan, constituted a request to appellant to advance the money on the note, and they are estopped from complaining of the acts of the agent in whom they confided." (3) "Even if they had been without negligence in endorsing the note at his request, they delivered it to him to be carried to and cashed by appellant, and where one of two innocent parties must suffer by the act of a third, he whose act has enabled such third person to cause the loss must sustain it." But these affirmations all ignore the defense interposed. If that defense be deemed established, then the defendants did not create an agency or trust, and they did not intentionally or knowingly give the appearance of validity to the paper, as asserted. Their respective endorsements, if obtained under the circumstances alleged, were no more their acts than if they had been forged. [Gibbs v. Linabury, 22 Mich. 492.] In fact fraud in the inception, such as is pleaded in this case, is closely akin to forgery; so much so that it may be proved under a plea of *non est factum.* [Kalamazoo National Bank v. Clark, 52 Mo. App. 593.] The liability, if any, of one whose signature is obtained to a negotiable instrument in the manner in which defendants aver that theirs were obtained to the note in suit arises solely from negligence, and not otherwise. If there was no negligence, there is no liability. And this is so even though the instrument be in the hands of a holder in due course. Such was the rule at common law and such is unquestionably the rule in this State, unless it has been changed by the Negotiable Instruments Law. "Whatever the rule may be elsewhere, it cannot be doubted that the decisions in this State exonerate from liability, even in an action by an innocent holder for value, the signer of a bill of exchange or a promissory note whose signature was procured through fraudulent practices which deceived him regarding the instrument or its contents, if he was not himself remiss in failing to learn the contents." [Goode, J., in Bank v. Hall, 129 Mo. App. 291.]

With respect to the rights of a holder of a negotiable instrument for value, and without notice, a distinction was made at common law between fraud in the *factum* and "fraud in the inducement." By the latter was meant that, though the signer at the time of signing was fully advised as to the nature and terms of the instrument, he was induced to sign it through deception practiced upon him. In such case the fraud was not available to him as a defense as against a bona- fide holder for value. But as heretofore stated where the signer was deceived as to the character of the instrument, and signed without knowledge of it, and was himself free from negligence, he was not bound, even to an innocent holder for value. Whether the Negotiable Instruments Laws does away with the distinction just noted, in other words, whether all classes of fraud, including fraud in the *factum*, constitute a mere "defect of title" within the meaning of Section 55 (Sec. 841, R. S. 1919) from which a holder in due course holds the instrument free under Section 57 (Sec. 843, R. S. 1919), we need not determine, because the plaintiff in this case is not a holder in due course. There is great conflict of decision as to whether the payee of a negotiable promissory note may, under the Negotiable Instruments Law, be a holder in due course. [Brannan's Negotiable Instruments Law (4 Ed.) 361.] The question was answered in the negative by the Springfield Court of Appeals in Long v. Shafer, 185 Mo. App. 641, 648, and its holding was approved by this court in Long v. Mason, 273 Mo. 266, 278. Upon further consideration we are not disposed to de- part from the ruling there made.

"Since then the appellant, the payee, is a holder other than in due course, the note is 'subject to the same defenses as if it were non-ne- gotiable.' " [Long v. Mason, supra, l. c. 278.] Stated differently, the provisions of the Negotiable Instruments Law are not determinative of the rights and liabilities of the parties to this proceeding.

In view of the foregoing we are of the opinion that defendants' in- structions, and not plaintiff's Instruction "A," properly declared the law applicable to the issues.

2. The evidence having a bearing on whether defendants, in writ- ing their names on the note, were in the exercise of ordinary care, **Substantial Evidence.** or the contrary, has been set out at length, so that it may speak for itself. We have no doubt but that it presented a question for the jury.

II. 1. One of the defenses pleaded was that plaintiff had converted to its own use collateral notes of the value of $25,000 which had been pledged to secure the payment of the note in suit, "and that there- **Relevant Examination.** by said note and the plaintiff have been paid in full." On the trial it appeared from the cross-examination of plaintiff's witnesses that plaintiff had sold the collateral pursuant to notice and had bought it for $500, which amount it then

credited on the note. Subsequently plaintiff was advised that the sale was void, and it thereupon erased the credit and restored the collateral notes to the status of a pledge. Appellant contends that matters touching the sale of collateral constituted no defense, and the cross-examination of plaintiff's witnesses with respect thereto was prejudicial. But those matters had been pleaded as a defense, the validity of such defense had not been challenged by demurrer or otherwise, and with reference thereto the questions complained of were entirely relevant. We are at a loss to understand how the asking of the questions could have constituted error; but if it did, the error was cured by a withdrawal instruction.

2. The final assignment of error is the action of the trial court in overruling plaintiff's motion for a new trial. In this connection two grounds of the motion are stressed:

(a) During the progress of the trial and before the submission of the cause to the jury one of plaintiff's counsel, at a noon recess, found on a table in the jury room a current number of the St. Joseph Gazette, which displayed from the front page, under prominent head lines, a news item to the effect that three criminal causes **New Trial.** then pending against Bunton, president of the defunct Exchange Bank of Maysville, would be continued on account of his illness. Immediately following such discovery, the attorney took the paper from the room and showed it to the trial judge, "advising said judge that he had just found said newspaper so containing said article in the jury room and that said article had evidently been read by the members of the jury." But plaintiff's counsel did nothing more; they did not ask that the jury be admonished, or discharged; on the contrary they permitted the trial to proceed to a conclusion and culminate in an adverse verdict without voicing a protest of any kind. Their objection to the jury having read the newspaper item was raised for the first time in the motion for a new trial. It came too late; it had been waived. [Easley v. Railroad, 113 Mo. 236, 246; Partello v. Railroad, 240 Mo. 122; James v. Bowen, 83 Conn. 702; 29 Cyc. 813.]

(b) Improper argument to the jury on the part of defendants' counsel is the other ground of the motion for a new trial pressed under this head. Plaintiff's counsel objected to certain statements made in the course of that argument and the court ruled that some of them were improper. The ruling apparently satisfied the objector, because he interposed no further objection and saved no exception. The question now raised is not here for review.

The record disclosing no reversible error the judgment of the circuit court is affirmed. All concur, except *Gantt, J.,* not sitting.