The J. R. WATKINS COMPANY, Appellant,

v.

H. D. HALL and James Welsh, Respondents.

No. 23866.

Kansas City Court of Appeals.

Missouri.

June 1, 1964.

C. B. Burns, Jr., Brookfield, Brehmer & McMahon, C. Stanley McMahon, Winona, Minn., for appellant.

Errol Joyce, Brookfield, Robert N. Jones, St. Louis, for respondents.

MAUGHMER, Commissioner.

This is an action on an account for merchandise sold to Kenneth Clarence Hicks (dealer) brought against the defendants H. D. Hall and James Welsh, under the terms of the dealer's contract, payment of which was guaranteed in writing by Hall and Welsh as Hick's sureties. The jury's verdict was in favor of both defendants, and plaintiff has appealed.

Plaintiff, The J. R. Watkins Company, is a corporation engaged in the manufacture of goods and merchandise, primarily for home consumption, which are sold almost exclusively by individual door-to-door salesmen or dealers.

On August 24, 1949, Hicks as "Purchaser" entered into a written agreement with the company under which he agreed to buy and the company agreed to sell to him at wholesale prices some of its products. The agreement provided that the Purchaser pay for the goods by remitting 60 percent of his receipts from sales. This agreement was to continue in effect until December 1, 1951, but either party could terminate earlier by simply giving written notice to the other party.

The company produced substantial evidence that it shipped and Hicks received merchandise of a wholesale value of $1,307.-30, that Hicks paid $119.71 on the account and was entitled to a further credit of $5.40, leaving a balance due of $1,182.19. That such an amount was due with interest at 6 percent from January 20, 1956, was undisputed and, in effect, conceded.

On the lower half of this Agreement, covering only one page, there appears a printed paragraph followed by the phrase in capital letters "SURETIES SIGN HERE WITH INK", which paragraph was signed by both of the defendants in this lawsuit. This particular paragraph or surety guaranty provided that in consideration of the company's agreement to sell products to Hicks, the sureties "waive * * * notice of default or of nonpayment, and waive action required, upon notice, by any statute, against the Purchaser; and we jointly, severally and unconditionally promise, agree and guarantee to pay for said goods and other articles * * *".

On August 26, 1949, the company mailed to each of the sureties by registered mail the following notice: "We are pleased to inform you that we have received and accepted the Agreement of Mr. Kenneth Clarence Hicks, dated August 24, 1949, and expiring by limitation on December 1, 1951, which you have signed as surety. Yours very truly, The J. R. Watkins Company, H. Greene Contract Department". Return receipts signed by each defendant on August 21, 1949, were received in evidence and each defendant admitted at the trial that he had received this notification.

While appellant company on appeal alleges error in receiving certain testimony and in the refusal of a proffered instruction, we believe the vital issue on this appeal is presented by appellant's Point One, asserting that it was error to refuse its motions for a directed verdict against

each defendant. Determination of this issue requires a summarization of the evidence.

· It was the testimony of defendant Hall that at the time he signed as surety he was 62 years of age, had a country school education and was a long time employee of the Burlington Railroad as a telegrapher and station agent. He said that at the time he signed in August, 1949, he had just reached home from work, it was about 6:00 p. m. and Kenneth Hicks, whom he knew, came to his door with a paper in his hand and "asked me if I would sign it for him so that he could go to work for the Watkins Company". He stated Hicks told him it was just a recommendation and he (Hall) did not read the paper but just signed it. He said he used his own pen, placed the paper on the porch railing and signed his name. He saw another man whom he did not know, sitting in the car. Mr. Hall admitted that a few days later he received a registered letter from the company telling him that Hicks's application "which you have signed as surety" had been approved.

The defendant Welsh was 43 years of age when he signed as surety. He had finished two years of high school, been employed as a section hand by the railroad and as a laborer by a produce company. He described the actual signing as having occurred about 8:00 p. m., said he was mowing the yard when a car drove up, a man got out "walked up to me and introduced himself as 'Andrews' * * * He said he was a representative of the Watkins Company and that he was making inquiry as to the character reference of Kenneth Hicks and wanted to know if I knew Mr. Hicks and I told him that I did. * * * I asked him if he was wanting a letter of recommendation. He said 'Yes, it is more or less that, what you would call it. It was more or less a formality the company had to go through'. I said that if it was a letter of recommendation, I would sign it. I asked him if there had been anyone else sign it and he said that Harry Hall did. * * * He produced this paper and

handed it to me and handed me a pen from his pocket because I didn't have one with me". Mr. Welsh admitted he received the registered notice from the company a few days later but declared he did not know what "surety" meant. He said that he could read without glasses at the time he signed. Mr. Kenneth Hicks generally corroborated the testimony of Hall and Welsh relative to the circumstances of their signing.

Elbert J. Andrews (referred to by Welsh as the man who procured his signature) testified that from 1947 to August, 1949, he had been employed as a fieldman for the J. R. Watkins Company. He said his duties as fieldman were to recruit dealers and check on the financial responsibilities of sureties. He stated that he filled out an application for Hicks, who had been nominated by another Watkins dealer, and that he checked on the financial responsibility of Mr. Hall and Mr. Welsh as sureties. He denied having obtained Welsh's signature, and said the agreement bearing the signatures of both Hall and Welsh was brought to him by Mr. Hicks. Plaintiff's Exhibit 22 was received in evidence. It is a two page typewritten letter addressed to Elbert J. Andrews, fieldman, signed by the president of Watkins Company and entitled "SCOPE OF EMPLOYMENT & LIMITATION OF AUTHORITY Of Fieldmen Of THE J. R. WATKINS COMPANY, WINONA, MINNESOTA". We quote in part from the exhibit:

"In case the prospective customer desires Surety Agreement form of Credit Contract (under which his account with the Company will be secured by the guarantee of personal sureties), you will outline to him the Company's requirements for such sureties.

   *    *    *    *    *    *

"you are specifically forbidden to do any of the following:

   *    *    *    *    *    *

"Make any statement or representation of any kind whatsoever not in

accordance with the express terms and conditions of the Company's printed contract forms and relative printed matter.

"Have anything whatsoever to do with the negotiations between the prospective customer and his sureties, or prospective sureties, or be present at, or have anything to do with, such negotiations or dealings.

"Request or solicit any person to become a surety, or prospective surety, for any prospective customer".

We must of course consider that the jury found against plaintiff and for each defendant on the fact issues. Therefore, we shall assume that Andrews talked with Welsh and secured his signature and was seated in the automobile when Hall signed, pursuant to the request of Hicks. We also assume that both Andrews and Hicks represented the agreement as being merely a recommendation.

. ▉▉▉ Of course if Hicks was an agent of the company to make the contract and fraudulently represented the guaranty agreement as being merely a recommendation, then Hall has a good defense. The same is true respecting Andrews and Welsh. There is a second possible defense. It is the general rule that a surety is equitably estopped to deny liability if he had an opportunity to read the document but negligently failed to do so or failed to do what might reasonably be expected from one in his circumstances. Did the defendants Hall and Welsh exercise reasonable care as to informing themselves concerning the contents of the document which they signed? Was either Hicks or Andrews the agent of the company for the purpose of making this contract or waiving and abrogating its plain written provisions? We believe defendants have no substantial evidence of any such agency. In fact the written purchaser agreement and the document defining and limiting the authority of a fieldman such as Andrews,

indicates complete absence of such authority.

There are four opinions by our Missouri appellate courts which rather definitely declare the legal principles and apply such principles to factual situations quite similar to ours. We shall review those opinions.

In J. R. Watkins Co. v. Thompson, 230 Mo.App. 482, 93 S.W.2d 1100, 1103, the surety, John T. Watkins, signed what he believed was only a letter of recommendation. The verdict was for defendant. This court said:

"We conclude that under the law of the state of Missouri if one, by fraud and misrepresentation, is induced to sign one instrument under the belief that he has signed another instrument of different import and does not knowingly or intentionally give the appearance of validity thereto, such a signer is not obligated thereon *if he exercised prudent diligence within his ability to so do*. An instrument, to which the signing of same was so procured and induced, is no more the act of the one so signing than if his name had been forged to the same. Gate City National Bank v. Bunton, 316 Mo. 1338, 296 S.W. 375." (Italics added).

In that case the defendant Watkins was 85 years of age, with senile cataracts of both eyes, hardening of the arteries, heart disease, much trouble with his kidneys and prostate gland. He was an invalid, was being cared for by his daughter-in-law, but was approached and persuaded to sign in her absence and with no other friend or relative near to protect him. The court approved the jury's finding that in effect held "he [had] exercised prudent diligence within his ability to so do" and that a man in his condition could not reasonably be expected to do very much to protect himself from imposition. In addition, in this case, most of the credit which the company was seeking to collect from the surety had been

extended prior to the signing of the guaranty agreement.

The next case in this field includes an opinion by the Springfield Court of Appeals (J. R. Watkins Co. v. Oldfield et al., 168 S.W.2d 594) and one by the Supreme Court of Missouri (J. R. Watkins Co. v. Oldfield et al., 351 Mo. 894, 174 S.W.2d 142). In that case once more the suit was against the sureties and the defense was fraud and misrepresentation, the sureties allegedly having been told the agreement they signed was merely a recommendation. The jury verdict was for defendant. The Court of Appeals reversed outright and directed entry of judgment in favor of plaintiff for the amount sued for, with interest. The Supreme Court approved and affirmed the action of the Court of Appeals. For the facts we quote from page 142 of the Supreme Court opinion in 174 S.W.2d:

"The defense as interposed was that the signatures to the guaranty contract were obtained by fraud. O. B. Cushman testified that Oldfield informed Mrs. Cushman and himself that the paper writing was nothing more than a recommendation to the company; that Oldfield was in a hurry; that his, Cushman's eyesight was bad; that it was a cloudy day and he could hardly read the fine print so signed on the strength of what Oldfield had told him. After the Cushmans had signed the contract, and before any merchandise was sold to Oldfield, they received a letter from plaintiff corporation advising them that they had been accepted as guarantors for the payment of goods to be sold to Oldfield. Respondent Lola M. Cushman testified that when they received the letter: 'That was the first I knew that I had signed the bond. I did not know what to do, I let matter drift along until sued.' The court of appeals was correct in ruling that under the pleadings and evidence the trial court should have directed a verdict for plaintiff. Both respondents

were able to read and write and to understand the nature of the contract they had signed. Even if Mr. Cushman's eyesight was poor his wife was present and could easily have read the paper they were asked to sign. In addition to that plaintiff notified them before parting with any of its property that they had signed a contract of guaranty for Oldfield. In the circumstances the defense of fraud was not available to respondents".

The court distinguished that case on the facts from Watkins v. Thompson, supra.

The Supreme Court of Missouri en Banc, in April, 1953, (J. R. Watkins Co. v. Lankford et al., 363 Mo. 1046, 256 S.W.2d 788) again considered this question from both the legal and factual viewpoint most fully. We quote from the opinion sufficiently to state the facts and declare the rules:

"Defendants' evidence was that their signatures as sureties were obtained by fraud by Baker and Paul Corbin, who was with him when Sanders signed, saying the paper was only a recommendation. In the case of Sanders (who is the only defendant now contesting plaintiff's right to judgment) Baker and Corbin drove out to his home and found him in the driveway. Baker got out first and asked Sanders to sign (saying it was a recommendation) while Corbin remained in the car. (Baker said he had never read the document but took Corbin's word for what was in it.) Sanders said, after he had talked with Baker, 'he (Corbin) got out and said that he wanted me to sign this recommendation for Mr. Baker to sell Watkins' products and I said that I didn't have my glasses and couldn't read without them and I said that I didn't want to sign anything that would hurt me in any way and he said there was nothing there that would hurt me and that it was just a recommendation for Mr. Baker.' Sanders then signed without

going into the house for his glasses. Baker's contract and the suretyship agreement were both printed on one long (legal size) sheet of paper. Defendants' evidence showed that Sanders could not read without his glasses, but had 20–20 vision with them.

"Plaintiff's evidence was that it wrote letters dated March 28, 1939, to each of the sureties on Baker's contract (dated March 25, 1939 and terminating April 1, 1940) which were sent by registered mail with directions 'Deliver to addressee only. Personal receipt required.' The letter to Sanders said: 'We are pleased to inform you that we have received and accepted the Agreement of Mr. John Baker dated March 25, 1939, which you signed as surety, together with Louis Wilkerson and J. L. Lankford.' Plaintiff had a registered mail receipt, dated April 6, 1939, signed 'T. J. Sanders.' However, Sanders denied receiving the letter and said he did not think the signature on the receipt was his signature. We must, of course, consider that the jury found against plaintiff on the fact issues.

"The first question is whether the fact that the suretyship agreement was fraudulently misrepresented to Sanders by the principal Baker, and also by Corbin, as only a recommendation, is any defense to plaintiff's action on the agreement. Of course, as authorities hereinafter referred to hold, that would be a defense if either Baker or Corbin were agents of plaintiff to make the contract. However, as hereinafter shown, defendants had no substantial evidence of such agency. The Court of Appeals followed its previous decision in General Motors Acceptance Corporation v. Holland, Mo.App., 30 S.W.2d 1087, 1090, in which it said in a similar case: 'The evidence fails to indicate that plaintiff had knowledge of such deception or the circumstances under which defendant signed the guaranty. It therefore should not be made to suffer the loss brought about by defendant's blind trust in another. The old equitable rule is applicable that, where one of two innocent parties shall suffer by reason of the fraud of a third person, the one who permits himself to be deceived and thus puts it in the power of such third person to defraud another should be the loser rather than the latter.' The great weight of authority is in accord with this statement of the rule. (citing authorities)." Both Baker and Corbin were Watkins dealers.

The court then distinguished that case on the facts from those in the Thompson case and said:

"The facts in the Thompson case were very different as we pointed out in the Oldfield case, supra, 174 S.W.2d loc. cit. 143. In the first place, 'the full debt sued for in this case was past due when defendant Watkins (surety therein) signed his name.' Thus plaintiff therein had not 'extended credit to the principal on the security of the surety's promise' as required by the rule stated in Sec. 119, Restatement of Security. Furthermore, the age and physical condition of the surety was very different as he was apparently an invalid afflicted with hardening of the arteries, heart disease, prostate gland and kidney trouble and was unable to read because of cataracts affecting both eyes. The real basis of the equitable rule applied in these cases is in the nature of an estoppel against the surety who had an opportunity to read the instrument but did not do so; and *it is his negligence in failing to do what it was reasonable for him to have done that is the basis of the estoppel.* Of course, this rule could not be applied to the same extent against a blind man, or an illiterate man who could not read, because he would have to rely on another to read it to him". (Italics ours).

**882**

Respondents in their brief say that neither Hall nor Welsh "understood the meaning of the word 'surety' as used in the contract sued on", and that this brings the case within the rule on illiteracy announced in J. R. Watkins Co. v. Lankford, supra. It is there held that the rule denying recovery for failure to read a contract "could not be applied to the same extent against a blind man, or an illiterate man who could not read, because he would have to rely on another to read it to him". Neither Hall nor Welsh was illiterate. Both could read. Neither was blind. There is quite a difference, we think, between a man who is blind, and a man who has eyes but does not use them.

■ There is no substantial evidence in our case that either Hicks or Andrews was an agent of the company authorized to make the contract or abrogate the plain provisions of the guaranty agreement. In fact the evidence is quite clear that they had no such authority. It is further our opinion that both Hall and Welsh had an opportunity to read the instrument but did not do so and considering their general capacities and abilities at the time, were negligent in failing to do so and hence are estopped to deny their liability. We are impelled to these conclusions, we think, by the results reached in the opinions which we have reviewed hereinabove. We hold that the trial court erred in refusing to direct a verdict for plaintiff for that sum which admittedly was due if defendants were liable.

The judgment for the defendants is reversed and the cause remanded with directions to enter judgment against defendants in the sum of $1,182.19, with interest at the rate of 6 percent from January 20, 1956.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion by MAUGHMER, C., is adopted as the opinion of the Court.

All concur.