Chase Gillen, Appellant, v. W. E. Bayfield.—46 S. W. (2d) 571.

Division One, February 11, 1932.

*W. B. & Ford W. Thompson* for appellant.

HYDE, C.—This is an action for damages for breach of an alleged contract to sell plaintiff a 40 per cent interest in a hotel corporation and employ him as manager.

Defendant, on January 9, 1925, entered into a written contract to purchase for $230,000 from the owner, Mr. Sodini, all the capital stock of the Majestic Hotel Company, which operated a hotel in St. Louis. Defendant paid $5,000 in cash on the purchase price, and was required by the contract to pay $100,000 in cash on February 1st, and give notes totalling $125,000, payable $1500 per month for the balance. February 1st came on Sunday and defendant claims that the contract required settlement on Saturday, January 31st. (The contract was not in evidence). Defendant had previously talked to plaintiff about going into this deal. They had looked over the hotel together; gone through its books; and checked up the business it was doing. They met again in St. Louis on the day defendant made the contract with Sodini. Plaintiff owned a one-half interest in a hotel in Wichita, Kansas, and could only get the money to pay one-half of the cash payment by selling it.

On the day defendant made the contract with Sodini he wrote out the proposition he made to plaintiff, which was:

"I agree to sell to Mr. Charles Gillen 50% of the capital stock of the Majestic Hotel Corporation of St. Louis, Missouri, at the same price and terms that the stock is sold to me by Mr. Sodini; Mr. Charles Gillen agrees to pay his 50% of the purchase price in cash, and 50% of the working capital. The deal is to be closed February 1, 1925. But Mr. Gillen must notify me that he will take the stock as above outlined not later than the 20th of January, 1925. Salaries to be $950.00, as follows: $650.00—$300.00 per month. Mr. Gillen $650.00 and Mr. Bayfield $300.00, and railroad fare to and from Terre Haute, Indiana. Mr. Gillen to have rooms and board for himself and family.

"(Signed)        W. BAYFIELD."

Defendant was very anxious for plaintiff to go into the deal, but plaintiff either was doubtful about going into it or was unable to make arrangements to raise the money. Defendant sent plaintiff letters and telegrams urging him to go ahead with the deal and offering to help him raise the money. The following were some of the telegrams:

January 12, 1925: "Terre Haute, Indiana. To Chas. Gillen. 'Please wire if you are sure of going in on the Majestic. Have several parties anxious to join me. Prefer you but would like to know. Please wire. W. E. Bayfield, Deming Hotel."

January 16, 1925: "If you would prefer not to buy in St. Louis it will be OK with me, but please let me know as soon as possible. W. E. Bayfield."

January 20, 1925: "If I must put up Ten Thousand Dollars more than my share, will expect stock for it, giving you contract to purchase it at cost price. Am willing to advance this, but must not be put off again, time is too short. W. E. Bayfield."

January 21, 1925: "I promised to give you the opportunity to buy with me; if you can't make it go, let me know. I have sold enough stuff to take my half. If I have to finance the whole, must know, as the market is changing each day. In answer to your letter just received, hope you can make it, but let me know today, Wednesday, sure. I can't take further chances. W. E. Bayfield."

There were two other telegrams on January 21st by which defendant arranged for plaintiff to meet him at Terre Haute, Indiana, on January 22nd. At that time plaintiff, definitely, advised defendant that "he would be short, in raising enough cash to buy a half interest, because he would have to take some notes" to make a sale of his Kansas hotel interest. Defendant then agreed to let plaintiff in the deal with a purchase of less than half of the stock. Defendant signed and delivered to plaintiff the following proposition, which plaintiff claims was a modification of the proposition of January 9th, to-wit:

"This agreement made and entered into this 22nd day of January, 1925, by and between W. E. Bayfield, of Terre Haute, Indiana, and Charles Gillen, of Wichita, Kansas; Mr. W. E. Bayfield having purchased the entire capital stock of the Majestic Hotel Company, a corporation organized under the laws of the State of Missouri, this stock being the entire capital stock representing the ownership of the Majestic Hotel, St. Louis, Missouri.

"Mr. Charles Gillen desires to purchase a portion of the stock of the Majestic Hotel, and Mr. W. E. Bayfield agrees to sell to Mr. Charles Gillen any portion of the stock up to 50% and not more than 50% of the stock, upon the following conditions:

"Mr. Charles Gillen is to purchase the stock at the same price and under the same conditions that Mr. W. E. Bayfield has purchased the aforesaid stock.

"Mr. Gillen is to have the management of the hotel and give it his entire time and personal supervision at a salary mutually agreed upon. [Here follow provisions concerning the management of the hotel and for plaintiff to sell out to defendant in case of disagreement.]

"This agreement to sell stock to Mr. Charles Gillen is subject to an agreement entered into by Mr. W. E. Bayfield on January 9, 1925, with Mr. Harry Sodini, it being understood that if Mr. W. E. Bayfield cannot effect this deal with Mr. Harry Sodini, in that event this agreement would become null and void and binding in no way to Mr. W. E. Bayfield. This agreement and conditions of sale are binding upon Mr. Charles Gillen, his heirs and assigns.

"(Signed)     W. E. BAYFIELD.
"(Witness) GEORGE P. KOHLER."

While this written proposition did not specify any certain amount of stock which plaintiff was to take, both parties claim that it was expected that defendant, if he came in at all, would take 40% of it and that $40,000 was the amount he undertook to raise. Up to this point, the evidence is harmonious as to the facts, but the parties violently disagree as to what afterward transpired.

According to plaintiff's evidence, which was his own testimony, except the bank records, he sold his Kansas hotel interest for $25,000 in cash and $25,000 in notes; and in order to be on the scene, on the day the deal was to be closed between defendant and Sodini, drove from Wichita to St. Louis, a distance of some 500 miles, over rough and frozen roads, arriving on the evening of Friday, January 30th. He went to the Marquette Hotel and went to bed, first leaving a call for defendant at the Majestic Hotel. About nine o'clock that night defendant "called him on the phone and asked him to come right down to the Majestic Hotel; that he told him that he was worn out, was ready for bed." Plaintiff said that defendant told him the deal would have to be closed the next morning; and that he told defendant that he had to go to East St. Louis to get some more money in order to raise his $40,000 in cash, but would be at the Majestic at ten o'clock in the morning. He said he had $25,000 on deposit in the National Bank of Commerce in St. Louis; that he went the next morning (Saturday, January 31st) to the Southern Illinois National Bank in East St. Louis and arranged for enough money there to make a balance of $15,000 in that bank; that he called defendant a few minutes before ten A. M. from the East St. Louis bank and told him he had the money and would be there as soon as he could drive over; and that he got to the Majestic Hotel a few minutes after ten o'clock. He found defendant very angry. He said he had been sitting there all morning waiting for plaintiff; that he was giving him a lot of anxious moments; that he had just telephoned to Chicago and arranged to get the balance of the money there; and that he was going to take care of it himself and was not going to bother with plaintiff. Defendant and Sodini then went to an attorney's office and closed the deal. Plaintiff said that he moved to the Majestic Hotel that night, and had some further conversation with defendant during the next few days, but that defendant refused to sell him any of the stock and finally ordered him out of the hotel.

The records of the Bank of Commerce, produced by plaintiff, showed that $25,000 was deposited to his credit there on January 26, 1925. The records of the East St. Louis bank, which plaintiff also offered in evidence, showed that on *January 30, 1925*, three deposits were made to plaintiff's account, totaling $11,500, which made his balance on that day $15,121.50.

Defendant's evidence, which was corroborated by W. E. Vaughn, the broker who made the deal between defendant and Sodini, and also, as to what happened on the 31st by Mr. Sodini and Mr. Lloyd, an employee of defendant, was that plaintiff arrived in St. Louis a few days before the 30th and stayed at the Majestic Hotel until that day or the 29th when he moved to the Marquette Hotel; that Thursday or Friday plaintiff told Sodini he did not have the money to go through with the deal and asked him "to put the matter off for awhile," which Sodini refused to do; that when defendant reached him on the phone on the night of the 30th, plaintiff said he did not have the money, but thought he could raise $25,000; and that he could not get the money until Monday. Defendant had only arranged to take care of 60% of the purchase price and was relying upon plaintiff for the rest. When plaintiff told him the night of the 30th that he did not have the money and did not think he could get it until Monday he began to make arrangements that night to raise the balance himself. He was finally successful, in raising it, the next day by putting up securities belonging to his wife and made the final arrangements, which enabled him to close the deal and saved his $5,000 payment from being forfeited, only ten minutes before twelve o'clock on Saturday.

Defendant's evidence was further that plaintiff was in the Majestic Hotel Saturday morning, and gave him to understand that he had been disappointed in getting his money and neither offered him the money, nor said he had it, nor asked to buy the stock; that two or three days later, plaintiff was arguing with defendant about the deal and defendant offered to close the deal with him then; but that plaintiff backed away and left, saying that defendant would never get his money. It was further shown that defendant only kept the hotel until March 10, 1925, when he resold it to Sodini. Defendant said he sold it, at a considerable loss, in order to meet his obligations incurred in purchasing it. It was also shown that on April 11, 1925, plaintiff and a Mr. Olsen bought the hotel stock from Sodini, for $5,000 less than defendant had paid for it, and that they operated it until March 10, 1926, when plaintiff sold out his half interest to Mr. Olsen at a profit. During the time plaintiff owned it with Olsen, he was the manager and drew a salary of $500 per month and was, also, furnished meals and rooms for himself and family.

The verdict of the jury was for defendant. From the judgment on this verdict plaintiff appeals. The court refused to give plaintiff's Instruction No. 1, purporting to cover the whole case, but modified it in several respects, and gave it as modified. It is the refusal of this instruction and the giving of it as modified that the plaintiff assigns as error. This instruction, as offered, proceeded

on the theory that the propositions, of January 9th and 22nd, were entered into as contracts. It required the jury to find that the parties made a contract upon the terms of the proposition of January 9th (purported to set out its terms) ; and that on January 22nd they entered into another agreement which was intended to be a modification of the first one (only that the proportion of the stock plaintiff was to take was left to him to decide) ; and ended with the following paragraph:

"And if you further find and believe from all the evidence that on said 31st day of January, 1925, [or thereafter, and within a reasonable time after said purchase by defendant from Sodini] (if you find that defendant did purchase all of said capital stock of said Hotel Company from Sodini), plaintiff was ready, willing and able to buy from said defendant 40 per cent of said stock so acquired by defendant from said Sodini, and offered to take [and pay for] 40 per cent of the stock acquired by defendant from Sodini upon the terms and conditions as defendant had obtained all of said stock from Sodini, and in compliance with said agreement of January 22, 1925, above mentioned, and that the defendant refused to deliver to the plaintiff said stock, you are instructed that plaintiff is entitled to recover a verdict at your hands." (Words in brackets were omitted from modified instruction.)

This paragraph was modified to read as follows:

"And if you further find and believe from all the evidence that on said 31st day of January, 1925, plaintiff was ready, willing and able to buy from said defendant 40 per cent of said stock so acquired by defendant from said Sodini, and offered to *pay defendant $40,000 and* to take 40 per cent of the stock acquired by defendant from Sodini, upon the same terms and conditions as defendants had obtained all of said stock from Sodini and in compliance with said agreements of *January 9, 1925, and* January 22, 1925, above mentioned, *if you find they were made, and demanded that defendant deliver to him said stock,* and that the defendant refused to *accept said $40,000 and* deliver to the plaintiff said stock, *then* you are instructed that plaintiff is entitled to recover a verdict at your hands." (Words in italics added to modified instruction.)

Appellant's contention is that plaintiff's contract gave him the right to purchase the stock after defendant had obtained it from Sodini and that he was entitled to a reasonable length of time after defendant closed the deal and obtained the stock from Sodini to pay plaintiff for it. He says that the modified instruction erroneously required him to offer to pay defendant for it before defendant had obtained it. He also says that the instruction as modified required that plaintiff actually tender the $40,000, but that all that was necessary was that plaintiff was ready, willing and able to buy

the stock if defendant bought it and to pay for it within a reasonable time thereafter and that defendant repudiated the contract, before the time for plaintiff's performance arrived, which would make a tender unnecessary. Plaintiff does not consider that the questions involved require citation of authority because he considers them elementary. They are.

The essential elements of a contract are: "(1) Parties competent to contract, (2) a subject-matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." [13 C. J. 237, sec. 1. See, also, 6 R. C. L. 586, sec. 4.] If we take plaintiff's view of the deal that the two documents signed by defendant were intended to be a completed contract giving plaintiff the right, after defendant had obtained the stock, and paid for it, to thereafter buy any amount he desired up to 50%, then the court should have instructed the jury to find for defendant. Such a contract would be unenforceable and void, for want of mutuality, in fact no contract at all, because plaintiff would not be bound by it to do anything. As this court said of such a contract: "Mutuality of contract means that an obligation must rest upon each party to do or permit to be done something in consideration of the act or promise of the other, that is, neither party is bound unless both are bound." [Hudson v. Browning, 264 Mo. 58, l. c. 65, 174 S. W. 393. See, also, Huttig v. Brennan, 41 S. W. (2d) 1054, l. c. 1062, and authorities there cited.]

Another elemental rule, of contracts, is that it requires both an offer and an acceptance to make a contract. The written propositions of January 9th and January 22nd were signed only by defendant and plaintiff gave no consideration for either of them. Even if we considered them as options:

"An option confers no rights unless it possesses the elements necessary to an enforceable contract. One of these requisites is a consideration. Therefore, unless an option is supported by a consideration it is for practical purposes of no greater efficacy than a continuing offer." [6 R. C. L. 603, sec. 25.] "Frequently a proposal is made to be accepted within a specified time. Such a proposal constitutes a continuing offer. The effect of such an offer has given rise to much discussion, and was for a time involved in doubt. At present, however, it appears to be settled that such an offer confers on the offeree no greater right than is conferred by an ordinary offer; that is, the right to accept before the offer is withdrawn. A continuing offer is not a contract because it does not necessarily involve the assent of both parties, which is essential to the formation of the contract." [6 R. C. L. 603, sec. 25. See, also, Secs. 26 to 32; 13 C. J. 293, sec. 103.]

Taking this view which is more favorable to plaintiff than his own theory (because it leaves a question to submit to the jury) the proposition of January 9th was an offer to sell plaintiff 50% of the capital

stock. This offer required acceptance by January 20th, and it was not accepted. Both plaintiff's petition and instruction were drawn on the theory that plaintiff did accept this offer in time and had a valid contract for a one-half interest. But plaintiff proved that he did not, and there his case breaks. The second proposition was only a continuing offer to sell plaintiff any portion of the stock, up to 50 per cent, for which he could raise the money to pay. Probably, as plaintiff contends, the other terms of the January 9th offer were intended to be included in the new offer, and it was, no doubt, contemplated that plaintiff would, eventually, buy one-half. No time was fixed for plaintiff to say what amount of stock he would take, but one of the conditions of the contract of purchase provided for the time it was to be closed. It is clear from plaintiff's own testimony that he did not accept this offer before January 31st. If there was anything to submit to the jury in this case, it was whether or not plaintiff accepted it, on that date, before defendant withdrew it. From their verdict it is plain that the jury believed defendant's evidence and not plaintiff's. It is also evident, whether or not defendant was right in his belief that he had to close the deal on Saturday morning, or had until Monday, February 2nd, as plaintiff was contending, in order to prevent the forfeiture of his $5,000 down payment, that it was contemplated, when defendant made the offer of the 22nd, that plaintiff would not wait until the last minute to let him know if he would go into the deal. The evidence shows that the parties contemplated buying the hotel stock together and that one of the principal reasons, why defendant was taking plaintiff into the deal, was to have him furnish part of the cash payment. This is not a case where one party was merely making a sale to the other. It was understood between them that they would operate the hotel together and that plaintiff was attempting to raise the money to take only 40% because he could not raise enough to take 50%. The parties contemplated acceptance by, at least, an offer by plaintiff to pay his part of the cash payment. Plaintiff's explanation of why he did not tell defendant on the night of Friday, the 30th, that he was going to accept the offer and take 40% of the stock is certainly unsatisfactory, when his own evidence shows that he had his $40,000 then on deposit in St. Louis and East St. Louis. It looks as though plaintiff may have been affected with that condition known among traders as "cold feet," or, as seems possible in the light of subsequent events, wanted defendant to lose the deal so he could take it on more favorable terms for himself, as he did about two months later. There is, however, some basis in his evidence, if the proposition be considered a continuing offer, for the contention that he did accept it, before it was withdrawn on Saturday morning, by making an offer to pay his part of the cash payment, and it was proper to submit that question to the jury.

The court properly refused Instruction No. 1 offered by plaintiff. There are many reasons why it was erroneous. Some of them are: that it allowed the jury to find that plaintiff accepted the offer to purchase one-half of the stock prior to January 20th, when, according to plaintiff's own evidence, he did not; that it assumed that the propositions of January 9th and January 22nd were, prior to the 31st, valid contracts instead of merely unaccepted offers; and that it permitted the jury to find for plaintiff even though they found he did not offer to buy and was not ready, willing and able to buy 40% of the stock from defendant on January 31, 1925, but offered to buy and was ready, willing and able to buy the same within a reasonable time thereafter. Plaintiff's own evidence shows that defendant's offer was revoked on the 31st. Nor was the action of the court in giving the instruction as modified prejudicial to plaintiff. It was, in fact, too favorable to him.

The modified instruction only required the jury to find that plaintiff, *on January 31st*, offered to pay his part of the cash payment and to take 40% of the stock upon the terms and conditions of the contract with Sodini and the agreements of January 9th and 22nd. (It may be here noted that plaintiff's evidence does not show that he offered to or could put up any portion of the working capital, as required by the January 9th proposition, although it is his theory that the terms of that proposition remained in force except as to the amount of stock he would take, or that he offered to personally execute the notes for the balance of the purchase price to Sodini or assume any liability for them.) The instruction, as modified, still proceeds upon the theory that a valid contract was made, prior to the 31st, by the agreements of January 9th and January 22nd, for the breach of which plaintiff could recover unless he was unable or unwilling to perform. It permits a recovery upon a finding that plaintiff offered to go ahead with the deal at any time during Saturday, the 31st instead of limiting a recovery for plaintiff to a finding that he accepted defendant's offer at a time prior to its withdrawal, which, the evidence shows, was shortly after ten o'clock that morning. A judgment will not be reversed because the court erroneously gave an instruction which was too favorable to an appellant. [Cazzell v. Schofield, 319 Mo. 1169, l. c. 1188, 9 S. W. (2d) 580; Heigold v. United Railways Co., 308 Mo. 142, l. c. 154, 271 S. W. 773; Ellis v. Metropolitan Street Railway Co., 234 Mo. 657, l. c. 679, 138 S. W. 23; Wertheimer-Swarts Shoe Co. v. United States Casualty Co., 172 Mo. 135, l. c. 155, 72 S. W. 635; 61 L. R. A 766; Teasdale v. Stoller, 133 Mo. 645, l. c. 652, 34 S. W. 873; Smith v. City of St. Joseph, 122 Mo. 643, 27 S. W. 344; Berry v. Wilson, 64 Mo. 164.]

690

We do not think that the instruction, as modified, is susceptible of the construction that it required the finding of an actual tender of cash as plaintiff contends. The finding required was that "plaintiff was ready, willing and able to buy from said defendant 40% of said stock so acquired by defendant from said Sodini and *offered to pay defendant $40,000* and to take 40% of the stock acquired by defendant." This followed, exactly, the language of plaintiff's petition. The instruction plaintiff prepared said *"offered to take and pay for 40% of the stock"* which means under the evidence "offered to pay defendant $40,000." The instruction did not say that plaintiff must tender the $40,000 in money or currency. No one contended that this was contemplated or · required. The case was not tried on such a theory, and we see no reason to believe that the jury would put such a strained construction on it.

The judgment is therefore affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.