MERIT SPECIALTIES COMPANY, a Corporation, Plaintiff-Appellant, v. GILBERT BRASS FOUNDRY COMPANY, a Corporation, Defendant-Respondent, No. 42167—241 S. W. (2d) 718.

Division One, July 9, 1951.

*Edward H. Tenney, Jr.,* and *William H. Dahman* for appellant.

*McDonald, Bartlett & Muldoon, Henry S. Caulfield* and *Daniel G. Bartlett* for respondent.

HYDE, J.—Action to recover $153,503.30 damages for breach of contract. At the close of plaintiff's evidence, the Court sustained defendant's motion to dismiss "on ground that upon the facts and the law the plaintiff has shown no right to relief." The Court discharged the jury and entered judgment of dismissal from which plaintiff has appealed.

The principal questions briefed by the parties are: (1) whether the contract made in November 1947 was too indefinite and uncertain to be enforceable; and (2) whether agreement of April 1948 terminated the contract and released the parties from all liability under it.

It should be noted that defendant's motion to dismiss was the one authorized by Sec. 100 of the Code (Sec. 510.140, R. S. 1949), intended to apply to non jury trials, instead of a motion for a directed verdict, which is proper in a jury case as this one was, under Sec. 112 of the Code. (Sec. 510.280, R. S. 1949; See Munday v. Austin, 358 Mo. 959, 970, 218 S. W. (2d) 624, 631.) However, since Sec. 112 authorizes a dismissal by the Court, even if a motion for directed verdict is made, and an appeal from an involuntary dismissal is authorized, we can decide the questions raised.

The original contract was a letter, dated November 12, 1947, written by Ben H. Shanklin, plaintiff's president, and accepted by defendant. It was modified by a letter, dated December 3, 1947, likewise accepted; and after another letter of April 7, 1948 (also accepted) the effect of which is in dispute, all operations under the contract were suspended and never commenced again. The three letters were, as follows:

Gilbert Brass Foundry Co. November 12, 1947
5028 Farlin Avenue
St. Louis, Missouri
Gentlemen:

This will confirm the understanding and agreement reached by Mr. A. O. Spoeneman of this company and Mr. James Gilbert of your company, whereby we have agreed to take on certain work for you for a one-year period. We are setting out in this letter our understanding of the entire agreement, and if this meets with your understanding, we will proceed on this basis for the period mentioned.

You now place with Merit Specialties Co. a firm order in the total amount shown on the attached quotation, at the prices and terms set out in that quotation, except that the clause on the reverse side entitled, "cancellation" will not be applicable. It is agreed that this is a blanket minimum order, covering deliveries to be made by Merit over a period of one year from the date of this letter. You also agree to increase this blanket order on or before February 1, 1948, if market conditions warrant by an additional order for this period at the prices shown on the quotation, but the increase will not exceed 35% of that total quantity without our consent. As indicated, the price is f.o.b. your plant in St. Louis, and terms are 30 days net.

Delivery dates have been omitted intentionally from this order, so that you may schedule the times for delivery of these ordered items as conditions require. You will advise us on or before the 10th day of each month at the latest, of the deliveries desired by you for the following month, so that we will have at least twenty days in which to schedule that month's production of the items in accordance with your directions. Although we will make every effort to accommodate requests for accelerated production where the need was unforeseeable, still it is understood that deliveries are to be made generally at a uniform rate over the one-year period, with the option given to you to direct which parts shall be manufactured in particular months, and the order in which they are to be manufactured. It is also understood that future experience may indicate that a smaller quantity of a particular part may be desired during the year than ordered, and in that case such a reduction may be made by you provided we are notified of that reduction prior to our ordering the necessary materials for that part, and provided also that the quantity of other items is increased so that the total price of the blanket order, as increased on or before February 1, 1948, is not reduced.

In return for your placing this order with us, we agree that we will not during the period of this agreement, so long as you abide by your agreements, sell to any other jobbers, wholesalers, suppliers, distributors or retailers any of the merchandise or items listed in the attached proposal. We further agree to turn over to you all inquiries received by us from any such persons or companies. You also agree aggressively to promote the resale of the items ordered by this agreement, so that the order may be increased during the one-year period to the maximum amount possible; to the mutual advantage of both of us.

You agree that you will not have the items listed in the attached proposal form manufactured by any other person or company within a 500 mile radius of St. Louis, Missouri, unless the total amount ordered shall exceed the present order by more than 35%, and even in that case you will not permit manufacture by others unless we have been offered such work and have advised you in writing that we are unable to handle it.

You will not place orders for any particular [720] item on the attached proposal form during any one month which shall be less than one-day's production of that item at our plant under the schedule and system then being employed by us at our plant in manufacturing that item or similar items.

We will not be responsible for failures to make deliveries by reason of shortages, failure of regular suppliers to deliver according to desired schedule, or any conditions beyond our control.

After the end of the one-year period agreed upon, we will negotiate for an extension of this agreement on terms that will be to our mutual advantage in continuing further this work.

If the terms we have set out above in this letter meet with your understanding of our arrangement and agreement, kindly note your acceptance at the end of this letter, and we will proceed on this basis effective at once.

| | Yours very truly, |
|---|---|
| (CORPORATE SEAL) | MERIT SPECIALTIES CO., a |
| Attest: | Missouri Corporation |
| Wm. J. Mundy | by: Ben H. Shanklin |
| Wm. J. Mundy, Sec'y. | Ben H. Shanklin, Pres. |
| (CORPORATE SEAL) | GILBERT BRASS FOUNDRY CO., |
| | A Missouri Corporation |
| Attest: John A. Gilbert | By James F. Gilbert, Pres. |
| Sec'y. | |

**332**

Gilbert Brass Foundry Co. December 3, 1947
5028 Farlin Avenue
St. Louis, Missouri

Gentlemen:

As we have mentioned to you recently, we are anxious to cooperate with you fully in regard to the work covered by our letter contract dated November 12, 1947, and feel that it will be to our mutual benefit and advantage to extend the contract for an additional two years, making a total of three years. We will be glad to do so provided it is understood that the price of the various items covered by that contract will be adjusted each year on November 12, in case the price of labor and materials shall increase or decrease. Accordingly, we suggest that the next to the last paragraph of our November 12th letter be deleted, and the following substituted in lieu thereof:

"After the end of the one-year period, on November 12, 1948, this contract shall be extended automatically for an additional two years, provided, that on November 12, 1948, the prices set out in this contract shall be increased or decreased for the ensuing year by the amount of the increase or decrease in the cost of labor and materials to Merit Specialties Company on November 12, 1948 as compared to November 12, 1947, and provided that on November 12, 1949 a similar adjustment for the next year shall be made in the price of such items on the basis of increased or decreased costs on November 12, 1949 as compared to November 12, 1948.

"The parties to this contract realize that unusual conditions may arise in the future, after the expiration of the first year of this contract, in regard to certain of the items covered by this contract, whereby it will be to the mutual interest of the parties to make certain readjustments in the price of such items. If such conditions should arise, it is the agreement of the parties that negotiations will be entered into good faith for the purpose of making such equitable adjustments as may be deemed fair and reasonable and to the best interest of the parties under all circumstances."

[721] If this amendment to our November 12th contract meets with your approval, please sign the acceptance at the end of this letter.

Yours very truly,

(CORPORATE SEAL) MERIT SPECIALTIES CO.,
 a Missouri Corporation
Attest: By: Ben H. Shanklin
Wm. J. Mundy Ben H. Shanklin, Pres.
Wm. J. Mundy, Sec'y.

 Accepted:
(CORPORATE SEAL) GILBERT BRASS FOUNDRY CO.
 a Missouri Corporation
Attest: By: *James F. Gilbert*
John A. Gilbert James Gilbert, Pres.
 Secretary

Gilbert Brass Foundry Co. April 7, 1948
5036 Farlin Ave.
St. Louis 15, Missouri
Attention: Mr. James Gilbert

Gentlemen:

Reference is made to our current contract with your company for steel pipe fittings, and reference is made to our recent conference on April 2, 1948 in which you requested that we stop production under this contract.

According to agreement reached, we will complete and ship to you all work which is now in process as follows: 4,500 $\frac{1}{4}$ galvanized unions with brass seats; 1,000 $\frac{1}{4}$ black unions without seats; 2000 $\frac{1}{2}$ x $\frac{1}{8}$ galvanized bushings; 10000 $\frac{1}{2}$ x $\frac{3}{8}$ galvanized bushings and 6,000 $\frac{1}{2}$ black pipe plugs. These will be billed at the contract price.

In making this change in production, it is agreed that you will not be liable to us for the stoppage, and we will not be liable to you for any failure on our part to deliver any items under this contract. The effect of the change in production is to hold off manufacture on our part until you are in a position to continue.

When you are prepared to have us continue production under the contract, you will immediately notify us. We will be glad to cooperate with you to resume the work, but can give no promise to you as to the length of time it will take to get production under way again. You understand that it is necessary for us regularly to sell all open machine time, which may conflict with schedules you may later request from us and we are to be free to sell that open machine time in the interim.

Due to this change, it will be necessary for us to cancel our order for the 2-$\frac{5}{8}$" Acme-Gridley Screw Machine. You understand that disposal of the machine will affect our ability in the future to deliver the $\frac{3}{8}$", $\frac{1}{2}$", $\frac{3}{4}$" x $\frac{1}{2}$" and 1" unions now listed in the contract, and we will not be held responsible for any failures on that account.

The above is in accordance with our agreement of April 7, 1948. If we do not hear from you to the contrary immediately, we will proceed with this arrangement. However, we would appreciate your O. K. on the enclosed extra copy for our files. Thank you.

JFG - 4/8/48 Yours very truly,

 MERIT SPECIALTIES CO.
BHS:WJ Ben H. Shanklin

The modification proposed by this letter was accepted by James F. Gilbert, then president of defendant, initialing it on April 8, 1948 and returning one initialed copy to plaintiff.

As indicated in the letter of November 12, 1947, a "quotation"

was attached consisting of three sheets. This quotation covered 33 separate items, which were plumbing supplies mainly "used in hooking up water lines or gas lines in homes or business houses": These items were specifically described by measurements, a specific quantity of each size was stated, with a definite price per thousand for each. (Item 1 - 200,000 Hex Bushings, size $\frac{3}{4}$ x $\frac{1}{2}$, price 51.20/m. etc.) The prices quoted were graded according to the kind and size of the items priced; and not only did the prices to be paid by defendant for the various items vary, but the plaintiff's cost of production also varied, as would its profits from their production and sale. A reduced price on all items was provided in case they were furnished without plating.

Plaintiff contends that the contracts must be construed in the light of the surrounding circumstances, which we state most favorably to it. Plaintiff, organized in 1946, operated a contract machine shop preparing threaded bolts, screw parts and pipe fittings for manufacturers according to their specifications. Ben Shanklin was president of plaintiff. Defendant was a family owned corporation making brass fittings but also desired a line of other fittings to sell with them as there was a building boom under way at the time. At the time of the transactions above referred to, and until June 14, 1948, James F. Gilbert was defendant's president. He then went to Chicago, where he formed a sales corporation, and his brother John A. Gilbert, previously secretary and treasurer, became president. James Gilbert handled all negotiations with plaintiff prior to June 1948, and Warren Frey, in charge of defendant's purchasing, signed orders for it.

Soon after the agreement of November 12, 1947, defendant signed 58 purchase orders for items described in the quotation attached thereto. Plaintiff, then operating two shifts (16 hours), started a third shift and employed additional help, increasing its number of employees from 15 to 26, and stopped accepting orders from other people. It also increased the floor area of its manufacturing space by decreasing its office space and ordered the Acme-Gridley Screw machine (referred to in the letter of April 7, 1948) which was necessary to produce any fittings over $\frac{1}{4}$ inch. Plaintiff's president Shanklin testified that these larger fittings (which this machine would make) amounted in price to $115,000.00 of the total price of $206,000.00 for all the items described in the quotation. (This total price was later corrected by plaintiff's accountant to be $217,045.09.) However, some of these larger fittings, which plaintiff could not make without the Acme-Gridley machine, were supplied by plaintiff purchasing them from another St. Louis firm partly processed. Considering the items supplied by this means, plaintiff could supply all but $71,482.50, of the total amount described in the quotation, without the Acme-Gridley machine. This was the largest contract for orders plaintiff had ever had and was also the largest defendant had ever made.

Plaintiff had some difficulty getting started because the necessary tools were hard to get and steel deliveries were slow; but by the end of December, plaintiff had delivered about 35,000 parts and by the end of March they had it up to about 200,000. However, building did not start out so well that spring, and defendant was not able to sell the steel fittings plaintiff was furnishing. Malleable iron fittings were beginning to come back on the market and plumbers preferred them. Defendant had been late in making payments due on the orders delivered to them and there were conferences about marketing these steel fittings. On April 2, 1948, James Gilbert called Shanklin on the telephone and told him to stop production. Shanklin testified that "to stop production was like a bolt of lightning hitting the place." A conference was had between the parties that afternoon. Shanklin testified that James Gilbert was asked whether or not this was a termination or a cancellation of the contract and James Gilbert replied, "definitely not, it was just a temporary stoppage for a period of time;" that the temporary stoppage in production was just for a short time; and that he might call Shanklin in a day or two to resume production, or in a week, or in a month or so at the very most. James Gilbert wanted time to check his inventory and to check into the market to see why pipe fittings were moving so slowly at that time. He believed it was partly due to the fact that spring had come so late that year and building had not started as had been anticipated. Shanklin informed James Gilbert that it would be necessary to cancel their order for Acme-Gridley machine because the only work plaintiff had for that machine was defendant's work. (The cost of this machine would have been about $10,500.00.) James Gilbert made no objection to that. Nothing was said at the conference about terminating the contract.

After the meeting of April 2, 1948, Shanklin and James Gilbert had further meetings at which discussions were had as to re-designing unions to a smaller size and as to making fittings for a lower price, and also about advertising problems. After April 2, 1948, there were discussions between the parties almost every week. Plaintiff did solicit other work because James Gilbert had said that it might be safe for as much as a month or so. On June 29, 1948, Shanklin and John Gilbert, who had then succeeded his brother James Gilbert as defendant's president, had a meeting at which John Gilbert was asked what his company intended to do about the contract of November 12, 1947, as supplemented by the agreement of December 3, 1947, and requested that he inform appellant by July 16, 1948. On that date, John Gilbert informed Shanklin that they would have to cancel the contract. Shanklin was asked by John Gilbert to get together its costs for cancelling the contract and then there would be a future meeting. There never was a claim made by anyone, at any conference had with

defendant's representatives after April 2, 1948, of any termination or cancellation of the contract by the letter of April 7, 1948, until the fall of 1948.

However, John Gilbert, who became defendant's president in June 1948, said that he had never seen the letter of April 7, 1948, and did not know of its existence until November when his brother James, on a visit to St. Louis, told him about it. They looked through the files and found defendant's copy. James Gilbert corroborated this and Mr. Shanklin admitted that John Gilbert never mentioned this letter until that fall and that he had never told him about it. All of these witnesses were called by plaintiff and there is no evidence to the contrary. Therefore, there is no proof whatever that John Gilbert, during his negotiations with Mr. Shanklin that summer, did have knowledge of this letter. (See Draper v. Louisville & N. R. Co., 348 Mo. 886, l. c. 898, 156 S. W. (2d) 626, l. c. 633.) The direct evidence offered by plaintiff is to the contrary.

Plaintiff offered in evidence three unanswered letters written by it to defendant in June and July 1948 describing the stoppage as temporary, discussing the disposition of material purchased for use on defendant's orders, insisting on a decision concerning the contract by July 16th, and, thereafter, mentioning the termination of the contract as a request of defendant. These letters were excluded as self-serving and plaintiff assigns this as error. However, we find the statements in these letters to be cumulative of the oral testimony and further find that they would not change the construction and effect of the three letters, herein above set out, which constitute the agreement between the parties. It is, therefore, unnecessary to rule on their admissibility.

Plaintiff contends that there is at least a jury question as to whether there was a recision of the original contract by the April 1948 agreement. Plaintiff argues that its terms are ambiguous and are to be interpreted in the light of the parties' situation, accompanying circumstances and the acts of the parties in relation to it. Plaintiff says that, since the April 1948 agreement is silent as to time for resuming work under the original contract, the law will imply a reasonable time. They point to the terms "stoppage" and "change of production" used in the April 1948 agreement and the lack of such terms as "cancellation", "termination", "settlement" or "release." They contend that the meaning of this agreement was that plaintiff had merely given defendant a temporary period of a month or so during which production could be suspended without liability. The trouble with plaintiff's position is that, by the April 1948 agreement, it effectively relieved itself of all obligation to do anything.

The parties have extensively briefed and argued the question of whether the original contract of November 12, 1947, as supplemented by the agreement of December 3, 1947 was so indefinite and uncertain

or lacking in mutuality as to be unenforceable. It may be noted, as plaintiff contends, that where one party agrees to furnish and the other party agrees to buy items for a specified price to be selected from specifically designated items or group or class of items, there is a binding contract. (American Law Institute Restatement of Contracts, Sec. 32, Illustration 8, Annotation 105 A. L. R. 1101; Fuller v. Presnell, Mo. App., 233 S. W. 502.) However, there is another class of transactions within which it might reasonably be contended that this original contract should be placed, namely: that it could amount to no more than an offer for the formation of a series of contracts to come into existence from successive acceptances from time to time; that is acceptances by plaintiff of defendant's contemplated monthly orders as they were made. (See American Law Institute Restatement of Contracts, Sec. 30; Schlitz Brewing Co. v. Missouri Poultry Co., 287 Mo. 400, 229 S. W. 813; Roberts v. Harmount Tie & Lumber Co., Mo. App., 264 S. W. 448; Malloy v. Egyptian Tie & Timber Co., 212 Mo. App. 429, 247 S. W. 469; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., C. C. A. 8th, 114 Fed. 77; Wickham & Burton Coal Co. v. Farmers Lumber Co., 189 Ia. 1183, 179 N. W. 417 and Annotations—Effect of Ordering Commodity, 14 A. L. R. 1309, 24 A. L. R. 1353; Willard, Sutherland & Co. v. United States, 262 U. S. 489, 43 S. Ct. 592, 69 L. Ed. 1086.) Although the original letter stated defendant was making a firm order (offer?) for all of the items specified in the quotation, plaintiff apparently did not unconditionally promise to furnish them or to do so at the prices specified. This is true because the letter of November 12, 1947 had some broad provisions in it to relieve plaintiff of performance. In the second paragraph it stated that defendant's order (for the first year) was "at the prices and terms set out in that quotation" attached, "except that the clause on the reverse side entitled 'cancellation' will not be applicable." (This clause prohibited cancellation of orders by the buyer.) One of the terms printed on the reverse side of the quotation was: "Until order is accepted prices are subject to change without notice." Another was: "The seller reserves the privilege of declining to make deliveries except for cash whenever, for any reason, doubt as to the buyer's financial responsibility develops, and shall not, in such event, be liable for non performance of contract in whole or in part." (Do these provisions imply that acceptance of each monthly order was required?) Furthermore, the third paragraph from the bottom of the letter was: "We will not be responsible for failures to make deliveries by reason of shortages, failure of regular suppliers to deliver according to desired schedule, or any conditions beyond our control." We do not hold that the original contract (or as modified by the letter of December 3, 1947) amounted only to a proposal for a series of contracts by successive acceptances. It is not necessary to decide that question because it is conceded that every specific order made prior to April 8, 1948 was fulfilled, delivered and paid for.

However, the view we take is that we must construe the three agreements together and decide their effect upon the rights and obligations of the parties as of April 8, 1948. While it may not have been intended that all relations between the parties concerning the subject matter were to be immediately and permanently terminated, because both parties may have hoped to have future dealings, nevertheless, it seems to be clearly expressed in the letter of April 7, 1948 that no definite commitment was made by either party as to ever resuming the making or purchasing of steel fittings. Apparently neither felt sure that the steel fittings would sell in any volume in the near future. Therefore, plaintiff wanted to use its available machines for other work and to cancel its order for the new machine that could only do defendant's work. Clearly, plaintiff provided for relieving itself of all liability to do anything and only proposed to consider for acceptance such further orders from defendant as it might decide to be convenient for it to supply at some indefinite time in the future. This is true because the third paragraph of this final letter said: ''We shall not be liable to you for *any* failure on our part to deliver *any* items under this contract.'' There is no limitation of any kind (as to time, subject matter or anything else) in this language and it is, therefore, broad enough to completely relieve plaintiff of any further obligation whatever, which it did not thereafter accept. This provision left performance completely at plaintiff's option when and if defendant should call for any of the items originally specified. No other parts of the letter conflict with or limit this provision: In the same paragraph, the effect is stated to be ''to hold off manufacture on our part until you are in a position to continue''; and in the next paragraph it is stated: ''We will be glad to cooperate with you to resume the work, but *can give you no promise* as to the length of time it will take to get production under way again.'' Thus it was not only provided that plaintiff would not manufacture any of these items before defendant asked for them, but plaintiff did not agree to ever do so. Furthermore, since in the next to the last paragraph, it was stated that the machine (which was necessary to produce half of the items originally covered by the contract) would not be purchased, plaintiff was no longer intending to prepare to ever accept orders for those items.

If plaintiff was not bound neither was defendant. (Great Eastern Oil Co. v. DeMert & Dougherty, 350 Mo. 535, 166 S. W. (2d) 490; Gillen v. Bayfield, 329 Mo. 681, 46 S. W. (2d) 571; Hudson v. Browning, 264 Mo. 58, 174 S. W. 393; Terre Haute Brewing Co. v. Dugan, C. C. A. 8th, 102 Fed. (2d) 426; See also Restatement of Contracts, Sec. 2, comment b; 1 Williston on Contracts 349, Sec. 104.) Therefore, defendant was free to withdraw its blanket offer to buy any of the originally specified items which plaintiff would manufacture; and

the April 1948 agreement might reasonably be construed as agreeing that defendant's offer was withdrawn. In any event, defendant certainly did withdraw it when it informed plaintiff that it would buy no more of them, declaring the contract to be terminated. It is undisputed that it did this at least by November 1948 (if not on July 16, 1948) and that plaintiff had not manufactured or bound itself to manufacture any of these items in the meantime. Thus no basis for any liability of defendant was shown.

The judgment of dismissal is affirmed. All concur.