EWING Y. MITCHELL, (Plaintiff) Respondent, v. T. F. PHILIPPI, (Defendant) Appellant, No. 41184—223 S. W. (2d) 441.

Division Two, September 12, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, October 10, 1949.

*Joseph N. Hassett, Ernest E. Baker* and *Watts & Gentry* for appellant.

*William D. Tatlow* and *Irl B. Rosenblum* for respondent.

TIPTON, P. J.—This is an action by respondent to recover compensation for his services in procuring a purchaser of all the capital stock of the Excelsior Tool & Machine Company, owned by appellant. In the trial court the respondent obtained a verdict for $10,000 and $4,080 interest, a total of $14,080, and a judgment was entered for that sum against the appellant. From that judgment the appellant has duly appealed to this court.

Appellant's first assignment of error is that the trial court erred in overruling his motion for a directed verdict at the close of all the evidence in the case. To decide this assignment it will be necessary for us to state the evidence that is most favorable to respondent.

In the fall of 1940 the respondent met an old acquaintance by the name of McCausland and learned that he and Schein, a real estate broker, were endeavoring to sell the Excelsior Tool & Machine Company which was owned by appellant and that they had an option on this property for $142,500. These men desired the respondent to assist them in the sale of the property. On that day Schein went with respondent to the office of the Excelsior Tool & Machine Company

and met appellant. Appellant told him that he would be glad if he would help Schein and McCausland sell the plant. Respondent made various efforts to bring about a sale of the business but was unsuccessful. On May 9, 1941, a contract was entered into between respondent and appellant giving respondent, Labert St. Clair and William H. Ludington an option to sell the plant for $75,000. The appellant came down in his price because he found that it was impossible to sell at the former figure. It was agreed if respondent and his associates realized more than $75,000, they should have any amount over that figure. This option expired on June 9, 1941, without a sale having been made although a great many prospective purchasers had been contacted by respondent. On June 14, 1941, a new contract was executed by the appellant. It read:

"In consideration of time and money heretofore expended and hereafter to be expended by E. Y. Mitchell of Springfield, Missouri, Labert St. Clair of College Park, Maryland, and William H. Ludington of Rosemont, Pennsylvania, in an effort to sell all of the capital stock of the Excelsior Tool & Machine Company, a corporation, of East St. Louis, Illinois, owned by me, I hereby grant to said E. Y. Mitchell, Labert St. Clair and William H. Ludington an exclusive option to buy all of said capital stock until the 10th day of July, 1941, at 2 o'clock P. M., for the cash price of Fifty Thousand Dollars ($50,000.00).

"It is understood that this option does not cover cash on hand, bills receivable, bonds and indenture bonds owned by the company at the time of the purchase under this option.

"It is further understood that this option covers all patents standing in my name, that all the property and the company are to be free from all debt at the time of the purchase under this option, and that the title to the real estate is good.

"Witness my hand and seal this 14th day of June, 1941.

T. F. Philippi (Seal)

"Witness to signature of T. F. Philippi.

Frank T. Schilling."

Respondent testified that he was to receive for his services in selling this property all over the amount stated in these options. In the May 9, 1941, option he was to get all over $75,000 and in the June option set out above he was to get all over $50,000. In this he was corroborated by appellant who testified as follows:

"Q. You don't know how many people came over to look about buying your plant? A. I gave Mr. Mitchell the right to bring anybody.

Q. Do you know how many? A. The only people I saw.

Q. How many did you see? A. I guess about eight or nine.

Q. You didn't get those people to come over there? A. No, no.

Q. And he did, didn't he? A. Yes, sure he did.

Q. He did that because you asked him to do it, didn't you? A. I told him, 'You know what I want, now go ahead, get the people.'

Q. What was he to get for his services in bringing a buyer to you? A. Mr. Mitchell wanted to get everything he could out of it.

Q. You gave him a price and anything he could get from a customer over that was to be his, wasn't that right? A. Yes.

Q. That was true of all these papers you signed; this one that has been marked Exhibit 2, that has the seventy-five thousand dollar price on it, if he would get anything over seventy-five that was to be his? A. Yes. That was all right.

Q. This one marked in the file, this last one you signed, for fifty thousand dollars, anything he would get over fifty was to be his? A. Yes, he was entitled to it.''

On July 2, 1941, the respondent was in Chicago and called on the firm of Winternitz & Company in an effort to interest them in appellant's property. They showed considerable interest and decided to send Lester Winternitz and Elliott Blumberg to look it over. They met respondent on July 3, 1941, at the Jefferson Hotel in St. Louis. He explained to them that the property would have to be sold for cash and made them the price of $60,000. He told them the terms of the contract of June 14, 1941, except for the $50,000 figure. They, with respondent, went to the plant, met appellant and looked over the property. After their return to St. Louis respondent told Winternitz and Blumberg that while he was selling the property for $60,000, that $50,000 would go to appellant and $10,000 would go to him as his commission.

These parties then went to see Earl B. Rosenbloom, an attorney, and after discussing the matter fully Rosenbloom wrote up a personal contract of purchase. Respondent telephoned appellant and asked him if he could get his papers that would show that the title to the real estate upon which the plant was located was good so that the deal could be closed Saturday morning, July 5th, but appellant stated that the next day was July 4th and his plant would be closed on that day, also on Saturday, and would not be open until Monday, July 7th. On Monday Winternitz, Blumberg, Rosenbloom and respondent went to appellant's plant in East St. Louis for the purpose of closing the deal with appellant. In the course of the conversation respondent said: ''Here is our contract, Mr. Philippi. I am ready to exercise this option and pay you this $50,000 for your property as soon as you endorse the stock in the corporation and give us a certificate of title to your property; or if you don't want to transfer the certificates of stock, if you will make these orders to sell the assets direct to Mr. Winternitz. Here's the paper.''

In the discussion that ensued respondent stated that the following conversation took place: ''Mr. Philippi said, 'I won't do anything about it.' He said, 'I haven't had a board meeting for fifteen years.

I got to get my papers put in shape.' Then I asked him, as I had on Sunday night, how long it would take. He said he didn't know. 'Well,' I said, 'Will it take a week or ten days? Surely that will be enough, or two weeks.' He said, 'I don't know.' 'Will it take a month?' 'I don't know.' 'Will it take two months?' He didn't know. I said, 'Well, will you extend this option then? You fix the time and extend this option to cover the time.' No, he said he wouldn't sign anything. I said, 'Will you give Mr. Winternitz a contract extending the time as long as you want it?' No, he wouldn't do that. He said, 'I am not going to do anything.' ''

Respondent also testified that one of the reasons that appellant told him why he would not go through with the sale was that his income tax would take too much of the sale price.

Frank Geppert testified on behalf of the appellant. His testimony was that in July, 1941, he heard that the Excelsior Tool & Machine Company was about to be sold. He went to see the appellant and asked him if he intended to sell the plant. Appellant told him that he wanted to sell it but there was an option on it and he could not sell until the option expired. Appellant promised Geppert if the option expired he would notify this witness of that fact. On September 25, 1941, appellant sold the common stock to Geppert for $56,100. The stock was put in escrow and was paid for out of the earnings of the plant. It was paid for in full in the year 1945.

Labert St. Clair and William H. Ludington in no way aided in contacting Winternitz & Company and therefore did not claim any part of the money that respondent sued for. They assigned any interest they may have had to respondent.

 We think under the above facts the trial court properly refused appellant's motion for a directed verdict. The pleadings and evidence clearly show that appellant employed respondent to find a purchaser of the capital stock of this machine shop. It is true the written instrument dated June 14, 1941, is in the form of an option but in effect is a written instrument evidencing the employment of respondent to find a purchaser of the capital stock of his company.

The general rule is well established that where parties have put their contract in writing, then, in the absence of fraud, accident or mistake, the law presumes that the writing embodies the agreement between them, and extrinsic evidence is not admissible to vary or contradict the terms thereof. But there are many exceptions to this rule which are as thoroughly established as the rule itself.

''Among these numerous exceptions is one, firmly established, to the effect that even where a written contract exists between the parties touching the same general subject-matter, extrinsic evidence may nevertheless be admissible in proof of a prior or contemporaneous collateral parol agreement between them, separate and distinct from that contained in the writing itself, and not inherently in conflict with

the latter." Bowers v. Bell, 193 Mo. App. 210, l. c. 218, 182 S. W. 1068.

When the evidence embraced within this record is properly considered, it does not appear that the contract sought to be enforced, established by respondent's parol evidence and the letters admitted in evidence, is in any way contradictory or repugnant to the written option of June 14, 1941.

It is quite clear the two are entirely consistent and that the signing of the written option and the consummation of the sale in accordance with the terms thereof were but steps in the execution of the parol agreement between the parties. The option paper on its face shows that the capital stock was to be transferred to a third party. The opening paragraph of the option contract of June 14, 1941, says: "In consideration of time and money heretofore expended and hereafter to be expended by E. Y. Mitchell * * * in an effort to sell all of the capital stock of the Excelsior Tool & Machine Company * * * owned by me, I hereby grant to said E. Y. Mitchell * * * an exclusive option to buy all of said capital stock until the 10th day of July, 1941, at 2 o'clock P. M., for the cash price of Fifty Thousand Dollars ($50,000.00)." This paragraph of the option clearly shows that the parties understood that respondent was to find a buyer for the capital stock and that it was not to be bought by respondent. It is entirely consistent with the oral contract which was admitted by both respondent and appellant. Under the oral contract the respondent was to find a buyer for the capital stock owned by the appellant and respondent was to receive any sum of money above $50,000 as compensation for his services.

The appellant contends that the rule is well settled that acceptance to close a contract on an offer must be absolute, unambiguous, unequivocal, without condition or reservation and in exact accordance with the offer. This rule of law is admitted by respondent. The appellant contends that the offer to buy the capital stock was not in accordance with the contract to sell.

In the first place, appellant contends that the offer to sell the capital stock was to sell it only to respondent and his two associates and not to Tom, Dick or Harry. We have just ruled this point against the appellant. However, the language used by respondent, "I am here ready to exercise this option", would give the appellant the right to transfer the stock certificates to respondent who could, in turn, transfer them to the purchasers he had procured.

Appellant also contends that the language used by respondent, "I will pay you this $50,000 for your property as soon as you endorse the stock in the corporation and give us a certificate of title to your property", was not in accordance with the option. Appellant contends that respondent made it a condition precedent before paying the money to endorse the certificates of stock and the furnishing

of a certificate of title which was, therefore, more than the option called for. We do not so interpret the acceptance of the option or the option itself.

The option was silent as to how transfer of the stock was to be made. It only provided for the sale of all the capital stock of the corporation for $50,000. The only way this stock could be transferred was by endorsing the stock certificates and delivering the same to the purchaser. The option necessarily contemplated such procedure. The option and the acceptance contemplated a simultaneous transfer of the endorsed stock certificates to the purchaser and the turning over of the money by the purchaser to the appellant. We think this contention is without merit.

The option states that "the title to the real estate is good." Appellant contends that if respondent wanted the title examined and a certificate furnished to him it was his duty, not appellant's, to order and pay for such certificate.

We think the argument is without merit. Under the laws of Illinois a purchaser of real estate is furnished a duplicate certificate of title by the registrar's office in the county where the real estate is located. See Sections 45-101, Chapter 30 of the Illinois Revised Statutes 1941 (State Bar Association Ed.). Section 91 of that chapter provides that a deed may transfer title "and upon filing such deed or other instrument in the registrar's office and surrendering to the registrar the duplicate certificate of title, * * * he shall make out * * * a new certificate, * * * and shall stamp across the original and surrendered duplicate certificate the word 'canceled'."

Since the real estate in question was located in Illinois, appellant was furnished a certificate of title by the registrar of the county where the real estate was situated when he recorded the deed to this property. It would not cost him an additional cent to furnish a certificate of title. Furnishing the certificate of title would be the proper way in that state to show "that the title to the real estate is good."

The respondent had until 2 o'clock P. M. of July 10, 1941, to introduce to the appellant a person able, ready and willing to buy the capital stock for the sum of $50,000. Under the facts in this record he did find purchasers who were willing, able and ready to pay $60,000, thus giving $10,000 to respondent as his commission. Respondent earned this fee, even though appellant refused to make the sale. Bowman v. Rahmoeller, 331 Mo. 868, 55 S. W. 2d 453; Tant v. Gee, 348 Mo. 633, 154 S. W. 2d 745.

The evidence shows that Samuel L. Winternitz & Company had the ready cash for the stock. It is true there was no tender made but that was not necessary for respondent to have earned his commission for procuring a purchaser of this stock. The appellant did not refuse to sell because no tender was made but he put his refusal

upon other grounds already set out. The trial court properly refused to direct a verdict for appellant.

Appellant's next assignment of error is that instruction No. 1, given at the request of respondent, is erroneous for the reasons (1) that there was no evidence that appellant employed respondent to sell the capital stock of appellant's company; (2) that the instruction required the title to the real estate owned by the company to be shown to be good; and (3) that it is further erroneous in permitting a recovery of a commission if the respondent found and brought to the appellant a purchaser who was ready, willing and financially able to purchase all the capital stock. We have already answered these contentions in ▆▆▆ ruling the motion for a directed verdict. They are devoid of merit.

Appellant also assigns as error the giving of instruction No. 2 at the request of respondent. He contends that this instruction repeats the errors found in instruction No. 1. For the same reasons this assignment of error is overruled.

His last assignment of error is the giving of instruction No. 8. This instruction told the jury that if they found for respondent, then the verdict should be for $10,000. Appellant contends there was no evidence to support this instruction. We have already stated that both appellant and respondent testified that respondent was to receive all over $50,000 that the stock sold for. The undisputed evidence was that the Winternitz people agreed to pay $60,000 for the capital stock. Therefore, the evidence shows that respondent was entitled to $10,000 commission and their assignment is without merit.

It follows that the judgment of the trial court should be affirmed. It is so ordered. Affirmed; all concur.