**W. S. BARKER and Margaret Barker,**
**Appellants,**

**v.**

**Lawrence E. ALLEN and Docia Mae Allen,**
**Respondents.**

No. 44325.

Supreme Court of Missouri.

Division No. 1.

Dec. 13, 1954.

Edwin W. Mills, Osceola, for appellants.

Ralph B. Nevins, Hermitage, Theo. G. Scott, Buffalo, for respondents.

LOZIER, Commissioner.

Plaintiffs-appellants Barker (husband and wife, hereinafter called plaintiffs) sued defendants-respondents Allen (husband and wife, hereinafter called defendants) for possession of real estate and for damages. Plaintiffs alleged that on January 1, 1952, they were the owners of certain premises in Weaubleau, and that on that date defendants took, and had thereafter unlawfully held, possession thereof. Defendants' answer "admitted that, on January 1, 1952, they were in possession of the premises," denied the other allegations of the petition and cross-claimed, alleging that "they and those under whom they claimed have been in open, notorious and peaceful possession of" the premises "for more than ten years prior to the filing of plaintiffs' petition * * *; that any right or claim that the plaintiffs are now making is barred" by limitations. Sec. 516.010—all section references are to RSMo 1949, V.A. M.S. Defendants asked determination of the title and that they be declared fee simple owners. Sec. 527.150.

The trial court (a jury was waived) found the issues for defendants, declared them to be the fee simple owners and further specifically found that they "and those under whom they claim have been in the open, notorious and peaceful possession of said premises, under color of title, for more than ten years prior to the institution of the present action." Plaintiffs appealed.

■ As title to real estate is involved, this court has jurisdiction of the appeal. Sec. 3, Art. V, Const., 2 V.A.M.S.; George v. Jester, Mo.App., 248 S.W.2d 453, 454 [2].

■ Under Sec. 510.310(4): Our review of this nonjury case is as if it were a suit in equity; with deference to the trial court's opportunity to judge the credibility of the witnesses, we weigh the evidence and make our own conclusions; and we may not set aside the judgment unless it is clearly erroneous. City of Kirksville v. Young, Mo., 252 S.W.2d 286, 288 [2]; Harrington v. Muzzy, Mo., 258 S.W.2d 637, 639 [4].

The parties are the record owners of contiguous tracts on the north side of Highway 54 in Weaubleau. Each tract is 132 feet wide and 160 feet deep. Plaintiffs' tract is west of defendants'. Plaintiffs' evidence showed plaintiffs' chain of title beginning in 1906, and defendants' beginning in 1919. However, we need only state that plaintiffs acquired the record title to the west tract on February 7, 1944, from Gladys R. Black and James M. Black, her husband, who acquired title on December 15, 1941, from Mrs. Knight, the owner since 1938; and that defendants acquired the record title to the east tract on December 11, 1944, from Owen Arent's widow; that the Arents acquired title on *March 3, 1941,* from John H. McCaslin, executor of the last will and testament of Sylvester Mackey, deceased. We emphasize this 1941 date because plaintiffs' petition was filed on *October 22, 1952.*

The land in dispute is the east 38 feet of plaintiffs' tract. This 38 X 160 foot plot is hereinafter referred to as the "plot." On the west side of the plot is, and for 35–40 years has been, a "solid" fence, i. e., with no gate in it. Defendants' evidence was that the fence had been rebuilt between 1919–1923 by Mrs. Hazel Babcock, the

owner of the east tract (defendants') between 1919–1923; and plaintiffs' evidence was that it had been rebuilt "jointly" by the owners of both tracts sometime prior to the death of Sylvester Mackey (defendants' predecessor in title) and Mr. and Mrs. Knight (plaintiffs' predecessors in title), or sometime prior to March 3, 1941. There was no evidence as to maintenance of the fence at any time and, particularly as to who maintained it after March 3, 1941, or December 15, 1941.

Mrs. Babcock testified that she used the plot for a garden; and that she built a fence across the front (south side) of it. Plaintiffs' evidence was that Mackey and the Knights "jointly" used the plot as a garden; and that Mackey told one witness that he (Mackey) was using the plot "by mutual consent of" the Knights. Defendants' evidence was that in 1938, Mackey's right-of-way deed to the state highway department was for a 170 (not 132) foot frontage on Highway 54.

However, we are not concerned with events prior to March 3, 1941. The issue is whether defendants and their predecessors in title had, for 10 years prior to the date the petition was filed—October 22, 1952—possession of the lot adverse to plaintiffs and their predecessors in title under Sec. 516.010. We have concluded that the trial court properly ruled that issue in defendants' favor.

As stated, the Arents acquired the east tract (defendants') from Mackey's executor on March 3, 1941. They lived there until Arent died in November 1944 and Mrs. Arent sold to the Allens (defendants) on December 11, 1944. Arent's son testified that his parents used the plot as a garden and claimed "to own all of the lot lying east of the fence which is on the west side of this garden spot" and exercised "the ordinary acts of ownership of all the property east of the present fence line on the west side of the Allen property during the time they owned it" and that, so far as the witness knew, during all that time no one had ever made "any claim to any part of the property" east of the present fence

"adversely to" his parents. The witness believed that if anyone had made such a claim he would have known it because "my father always confided in me and I would have known it if anything had come up."

Before defendants bought the east tract, they had visited the Arents and had seen them "gardening" the plot. After defendants acquired the east tract, in December 1944, they "used the garden and harvested the crops off of it" each year. Defendants said that, when they bought, Mrs. Arent told them that "all the land that was fenced in belonged to their place; * * * that that was the way they (the Arents) bought it and that was the way she (Mrs. Arent) was selling it."

Defendants Allen did not have the title examined when they bought. The first defendants heard of plaintiffs' claim was a year and a half or two years before the suit was filed. Allen said: "Mr. Barker came to me one morning, I was clearing the garden off, and asked me if I knew that was his land, and I said no, that we had bought it and paid for it. That is the first I knew about it. * * * I thought it was mine. I bought it." Allen did not know there was any dispute about the title until 1952—"I never thought of anybody trying to claim my land." Asked if he said anything to plaintiffs about it, he said, "Why, gosh, I didn't know they were claiming it. They were good neighbors before this came up." Mrs. Allen said that the Barkers were "very friendly" and continued so until the survey was made in 1952. During all the time they (defendants) had lived there, they had "claimed this property."

The parties introduced in evidence their tax receipts. However, the assessments were made by block-and-lot numbers and it is impossible to determine from the tax receipts whether plaintiffs or defendants, respectively, and their predecessors in title paid the taxes on the plot.

Plaintiffs testified that, when they bought the west tract in February 1944, the Arents were using the plot as a garden and con-

tinued to so use it until they (the Arents) sold to defendants in December 1944, and that thereafter defendants "gardened" the plot annually. Plaintiff Barker said that he had never "claimed to be in actual possession of" the plot; he had alleged in the petition that defendants "had possession because the fence was there. * * * I didn't know whether it was their land, and I didn't know until after it was surveyed that it belonged to me * * * and whether the fence was on my land as well as over on theirs." However, he had "had no objection" to the Arents and defendants "using" the plot. He didn't claim "to the fence" when he moved there, or claim "any land east of the fence. I had no reason to, I had a deed for it. I didn't claim anything. I now claim what my deed calls for." When he bought in 1944, "I never made any investigation or any check about what my deed covered. * * * It was my impression that my land went only to the fence." After the survey he "concluded" that he was "entitled to some 35 feet more land that these folks had fenced all the time" and up to that time nobody had "notified" him "except by open usage" that they had a claim to it. According to Barker, Allen saw the 1952 survey being made and removed the surveyor's stakes one night.

Plaintiff Barker admitted that both the Arents and the defendants had "used every indication of proprietorship that was known to people living on those premises," had "exercised control as if it was theirs," and that "although they were using it as if they were proprietors, and holding themselves out as owners," he had "never made any complaint about it" until he had had it surveyed about three months before he instituted the suit, and that he had never "disputed their holdings of ownership" until after that survey.

Mrs. Barker said that plaintiffs and defendants were "friendly" until plaintiffs had a survey made in 1946 (that survey was "no good because of technical reasons"); that both plaintiffs and defendants "measured" their respective tracts, each including the plot; that plaintiffs never went on the plot and, prior to the 1946 survey, they had "considered" that it belonged to the Arents and, in turn, to defendants—"we didn't know any different until we had our (1946) survey." They had said nothing to defendants about the survey "but they knew it"; and plaintiffs "made no adverse claim" to the plot after the 1946 survey and "never mentioned it" to defendants "until 1951 or 1952."

▮ Adverse possession is: "(1) * * hostile; that is, under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous." State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176 [4]. It is quite clear that, continuously since March 3, 1941, the only persons who ever had actual possession, full control and use of the instant plot were defendants and the Arents, their immediate predecessors in title. It is equally clear that that possession, control and use was adverse to the claims of the record owners of the plot since March 3, 1941—plaintiffs and their predecessors in title, the Blacks and Mrs. Knight. The Arents bought, claimed and sold to defendants the land "up to the fence." Defendants bought and claimed the land "up to the fence." In Tillman v. Hutcherson, 348 Mo. 473, 154 S.W.2d 104, 109 [9, 10], it was stated that if either owner of adjoining tracts "claimed to the fence unconditionally his possession was adverse, regardless of his reason, so long as it was actual, open, notorious, exclusive, continuous and under hostile claim of *ownership*, not necessarily claim of *right* in the sense of moral right, or even prior legal right." And see Anson v. Tietze, 354 Mo. 552, 190 S.W.2d 193, 196 [2-4].

▮▮ Here, believing that they were the record owners, the Arents had, and in turn defendants have had, continuous possession and use of the plot under claim of right hostile to plaintiffs' record ownership, for over 11½ years prior to the filing of plaintiffs' petition. We hold that defendants established their title under Sec. 527.150 by adverse possession for more than the 10-year period required by Sec.

516.010. Compare: City of Kirksville v. Young, Mo., 252 S.W.2d 286, 288 [3], [4]; Sanderson v. McManus, Mo., 252 S.W.2d 351, 356 [1, 2]. Contrast: Hatch v. Rhyne, Mo., 253 S.W.2d 170, 175 [9]; Eld v. Ellis, Mo., 235 S.W.2d 273, 275 [1–5]; Brown v. Chapman, Mo., 163 S.W.2d 920, 922 [2].

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.