Opal STAPLES, Plaintiff-Respondent,

v.

Leland S. O'REILLY and Elsie O'Reilly,
Defendants-Appellants.

No. 7395.

Springfield Court of Appeals.

Missouri.

March 26, 1956.

672

Ward & Reeves, Caruthersville, for defendants-appellants.

C. A. Powell, Dexter, for plaintiff-respondent.

STONE, Judge.

In this court-tried case, defendants appeal from the judgment for plaintiff (a) on her petition for $2,900 principal, $215.49 interest and $311.55 attorney's fee on a promissory note (hereinafter referred to as the Godfrey note) executed by defendants, (b) on defendants' counterclaim, in which defendants sought to recover $2,209.86, the amount of a check issued by them in payment of another promissory note in the principal sum of $2,900 (hereinafter referred to as the $2,900 Oliver note) executed by defendants, and (c) on defendants' "petition for equitable relief and declaratory judgment," in which defendants sought cancellation of three promissory notes in the principal sum of $553.33 each (hereinafter referred to as the three $553.33 Oliver notes), likewise executed by defendants.

In answer to plaintiff's petition on the Godfrey note, defendants pleaded that they had executed that note "as a part of a real estate sale transaction entered into with the plaintiff on December 15, 1952"; that the Godfrey note was, in fact, "a real estate sales commission for services rendered in said real estate transaction" by plaintiff's agent-husband, George Staples, Jr. (hereinafter referred to as George), who, being an unlicensed real estate broker [Section 339.010], "could not lawfully charge or collect a real estate sales commission" [Sections 339.020 and 339.160]; and that, therefore, the Godfrey note was "null and void for want of consideration." (All statutory references herein are to RSMo 1949, V.A.M.S.)

In their counterclaim, defendants averred that the $2,900 Oliver note and the three $553.33 Oliver notes (hereinafter collectively referred to as the four Oliver notes) "represented real estate sales commissions" to plaintiff "to be deducted from the purchase price" of a 456-acre farm which defendants contracted to purchase from Dearmont and Margaret Oliver; and, that the four Oliver notes were "null and void" for want of consideration or for failure of consideration because neither plaintiff nor George was at the time a licensed real estate broker or salesman [Sections 339.010, 339.020 and 339.160] and because the Oliver transaction was not consummated and no commission was earned. Defendants also alleged that they had executed the $2,900 Oliver note "with the understanding that said note was to be cancelled and returned to * * * defendants upon the delivery by them or for or on their behalf of one new Pontiac automobile to the plaintiff * * * or upon the payment of a sum of money equal to the dealer's cost of said automobile"; that, on February 4, 1953, defendant Leland S. O'Reilly (hereinafter sometimes referred to as O'Reilly) delivered to plaintiff's agent-husband, George, a check for $2,209.86 payable to the order of Jarvis Motor Company at Sikeston, Missouri, "which amount represented the dealer's cost of one Pontiac automobile"; and, that said check was, by George, delivered to and accepted by Jarvis "for the use and benefit of the said plaintiff and as the consideration for the cancellation * * * of the said $2,900 (Oliver) note," which (with the Godfrey note) had been pledged by George with

Jarvis. Defendants further pleaded (*in their amended answer but not in their counterclaim*) that ·O'Reilly instructed ·George "to apply the ($2,209.86) check in payment of" the Godfrey note but that George "*fraudulently* tendered and applied said check in payment of" the $2,900 Oliver note or payment of that note "was the result of a *mutual mistake*" on the part of George and O'Reilly.

We first refer to the evidence bearing ·upon the Godfrey note, on which plaintiff sued. By a written "Offer to Buy Real Estate" dated November 20, 1952, plaintiff's husband, George, offered to purchase a farm in Mississippi County, Missouri, from Ernest M. Godfrey for $20,000, of which $500 was deposited with the offer. Upon the written acceptance of Godfrey, this instrument became a valid contract[1] which, by its terms, obligated Godfrey to sell and George to purchase the farm therein described. On December 15, 1952, plaintiff entered into a written contract with defendants to sell the Godfrey farm to them for $25,000. On a subsequent date (not ·fixed in the record ·but prior to February 4, 1953) this farm was conveyed by Godfrey directly to defendants, and all of the agreed purchase price was paid· ·by defendants excepting only the $2,900. evidenced by the Godfrey note. Upon this state of facts, we are unable to find, as defendants would have us do, that plaintiff's action on the Godfrey note is within the statutory prohibition of· Section 339.160.[2] For, in our view of the matter, the Godfrey note did not represent "compensation for services rendered in * * * buying, selling (or) exchanging * * * real estate" [Section 339.160] but rather was a portion of the purchase price of the God-

frey farm payable by defendants to plaintiff under the firm contract by which plaintiff (not Godfrey) was obligated·to convey that tract. Furthermore, upon trial, O'Reilly significantly commented concerning the Godfrey note, "*that was the note I owed*." We are ·of the opinion that the judgment for plaintiff on her petition bottomed on the Godfrey note should be affirmed.

In their counterclaim, defendants seek to recover from plaintiff $2,209.86, the amount of a check issued by defendants to Jarvis Motor Company of Sikeston on February 4, 1953, representing "the dealer's cost" of a new Pontiac automobile. On December 13, 1952, Dearmont and Margaret Oliver entered into a written contract with defendants (hereinafter referred to as the Oliver contract), whereby the Olivers agreed to sell their 456-acre farm in Stoddard County, Missouri, to defendants for $91,200 to be paid as follows: $20,000 by conveyance to the Olivers of a tract owned by defendants (hereinafter referred to as defendants' garage property), on which they operated the Hi-Way Motor Company, the then Pontiac agency in Charleston; $41,000 by defendants' assumption of a loan secured by deed of trust covering the 456-acre Oliver farm; $25,640 by notes to be "dated the day of the closing of this transaction"; and, in the language of the Oliver ·contract—

"The balance of said purchase price, i. e., $4,560.00, · shall be paid to Opal Staples (plaintiff) as commission for the handling of this transaction and as follows. The parties of the second part (defendants) shall, within thirty days after the closing of· this transaction, as hereinafter set out, deliver .

---

1. "The essential elements of a contract are: '(1) Parties competent to contract, (2) a subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.'" Gillen v. Bayfield, 329 Mo. 681, 46 S.W. 2d 571, 574(1); State ex rel. St. Louis Car Co. v. Hughes, 348 Mo. 125, 152 S.W.2d 193, 198(6).

2. "No person * * * engaged within this state in the business or acting in

the capacity of a real estate broker or real estate salesman shall bring or maintain an action * * * for the recovery of compensation for services rendered in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person * * * was a licensed real estate broker or salesman at the time when the alleged cause· of ac·tion arose."·

to the said Opal Staples a new Pontiac automobile at list price, the difference between said list price of said automobile and $4,560.00, shall be evidenced by three promissory notes, due one, two and three years after date, to bear interest from date at 5%, said notes to be executed by parties of the second part."

Although not required so to do by the Oliver contract, defendants admittedly executed (under circumstances not reflected in the transcript) on December 13, 1952, the date of execution of the Oliver contract, the four Oliver notes payable to plaintiff's order in the aggregate amount of $4,560, all of which were post-dated to February 2, 1953, the date on or before which warranty deeds to the 456-acre Oliver farm and defendants' garage property were to have been exchanged. One of these post-dated notes, i. e., the $2,900 Oliver note, represented the *list price* of a new Pontiac automobile. The other three notes, i. e., the three $553.33 Oliver notes, represented "the difference between said list price * * * and $4,560." Notwithstanding the fact that the commission of $4,560 was, by the Oliver contract, to be paid to plaintiff, it is clear that her husband, George, acted as broker and that the four Oliver notes reflected the broker's commission claimed to have been earned by him, not by plaintiff.

Although there was nothing in the notes to that effect, O'Reilly said that he had an "understanding" with George that defendants were to deliver a new Pontiac automobile for each of the two $2,900 notes, i. e., the Godfrey note and the $2,900 Oliver note, and George's testimony tended to confirm such "understanding." Defendants had been allotted two new Pontiac automobiles for January, 1953; but, after they sold their agency at Charleston on January 17, 1953, some arrangement (not shown in the record) was made for those two automobiles to be sent to Jarvis at Sikeston. On February 4, 1953, O'Reilly and George went to Sikeston. They agreed upon trial that the purpose of this trip was to "pay" one of the two $2,900 notes, both of which

George had pledged with Jarvis on January 29, 1953, as security for a loan; but, O'Reilly and George were in violent disagreement as to what occurred at Sikeston.

O'Reilly's version was that, when he and George drove into the driveway at Jarvis' place of business during the morning of February 4th, O'Reilly handed George a check for $2,209.86 payable to Jarvis Motor Company; that George said "You wait here"—"I'll go in and get you the Godfrey note"; that O'Reilly then got into an automobile owned by George's brother, which he (O'Reilly) was to drive back to Charleston, and "started to warm it up"; that, observing "a friend of mine (Harry Richey) across the street there * * * I motioned him over and we sat there nearly ten minutes talking," until O'Reilly saw George coming out of Jarvis' place of business, when O'Reilly "jumped out of the car" and met George "about half-way between the car and (Jarvis') office"; and that, when George handed him an instrument with the comment "here is your Godfrey note," O'Reilly "glanced at it and seen the $2,900" but "it wasn't marked paid," so he inquired, "are you going to mark it paid," whereupon George "put it on the fender of the car and marked it paid and give it to me." Witness Richey corroborated O'Reilly.

On the other hand, George testified that, when he and O'Reilly reached Jarvis' place of business during the late afternoon, "we both went in together and walked back to the desk"; that, after "one of us told Mr. Jarvis we wanted to pay off one of those notes," Jarvis "got out the envelope in which I (George) had brought the notes over there, * * * laid the two notes on the counter and O'Reilly laid the check down and picked up a note and handed it to me and I marked it paid"; that O'Reilly "said in six or seven days he would take care of the other note"; that "nothing was said about any particular note" before George and O'Reilly went to Sikeston; and, that George did not care which of the $2,900 notes was paid, made no suggestion as to which one O'Reilly should pay, and in fact did not know at the time which

note O'Reilly had picked up and handed to George to be marked "paid." Witness Jarvis did not remember whether George or O'Reilly had handed the $2,209.86 check to him and had picked up one of the two $2,900 notes; but, Jarvis stated definitely that George and O'Reilly entered his place ·of business together between 4 and 5 p. m., that O'Reilly "had the check in his possession at the time he come in," and that, after either George or O'Reilly had picked up one of the notes from the counter, O'Reilly "said he expected to pay the other note in the next few days—he either said that or that he would see me about it." Witness Dixon, a salesman for Jarvis who was "working * * * on the outside," observed George and O'Reilly enter Jarvis' place of business together between 4 and 4:30 p. m. but did not see Harry Richey, with whom O'Reilly said that he had talked outside while George alone went inside.

 Defendants insist that the four Oliver notes were "null and void" for want of consideration because the Oliver transaction was not consummated and no commission was earned. On the other hand, plaintiff argues that, since as a result of George's efforts defendants and the Olivers entered into the Oliver contract which (as plaintiff says) was not consummated solely on account of a defect in defendants' title to their garage property, plaintiff's (in reality George's) commission was earned and plaintiff was entitled to payment of the $2,900 Oliver note. Of course, the general rule is that a broker earns his commission when he produces a party ready, able and willing to deal on terms prescribed by or acceptable to his principal,[3] and that the broker's right to recover his commission cannot be defeated thereafter either by his principal's refusal to consummate the transaction[4] or inability to do so by reason of some defect in the principal's title, of which the broker had no notice.[5] And since, in the Oliver contract, the parties agreed to convey their respective properties by warranty deed, the law implied an agreement on the part of defendants[6] that they would deliver to the Olivers a. marketable title[7] to defendants' garage property, but *not* that they would convey such title as the Olivers might be willing to accept or as their counsel might pronounce good and marketable.[8] Although the transcript shows that counsel for the Olivers would not approve the title

3. Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912, 913(1); Tant v. Gee, 348 Mo. 633, 154 S.W.2d 745, 747(2); Vining v. Mo-La Oil Co., 312 Mo. 30, 278 S.W. 747, 752(2); LeCompte v. Sanders, Mo.App., 229 S.W.2d 298, 301(2).

4. Mitchell v. Philippi, 359 Mo. 754, 223 S.W.2d 441, 445(5); Knisely v. Leathe, 256 Mo. 341, 372, 166 S.W. 257, 265.

5. Stone v. McConnell, Mo., 187 S.W. 884, 887–888(4); Politte v. Wall, Mo.App., 256 S.W.2d 283, 284(2); Prugh v. Tyrrell, 208 Mo.App. 582, 235 S.W. 143, 145 (5); Brown v. Smith, 113 Mo.App. 59, 87 S.W. 556, 559(2).

6. Rogers v. Gruber, 351 Mo. 1033, 174 S.W.2d 830, 831(5); McPherson v. Kissee, 239 Mo. 664, 144 S.W. 410, 412(3); Wiemann v. Steffen, 186 Mo.App. 584, 172 S.W. 472, 473(1).

7. A marketable (or merchantable) title has been defined as one " 'which would enable (the holder), not only to hold his land, but to hold it in peace, and, if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value' " [Thomas J. Johnson & Co. v. Mueller, 356 Mo. 1109, 205 S.W.2d 521, 527(5); McConnell v. Deal, 296 Mo. 275, 246 S.W. 594, 598 (5); Mitchner v. Holmes, 117 Mo. 185, 206, 22 S.W. 1070; Mastin v. Grimes, 88 Mo. 478, 490], and as a "title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept." Wiemann v. Steffen, supra, 172 S.W. loc. cit. 474(4); Kling v. A. H. Greef Realty Co., 166 Mo.App. 190, 148 S.W. 203, 205; Jamison v. Van Auken, Mo., 210 S. W. 404, 415.

8. Green v. Ditsch, 143 Mo. 1, 12, 44 S.W. 799, 802(4); Wiemann v. Steffen, supra, 172 S.W. loc. cit. 474(3); Kling v. A. H. Greef Realty Co., supra, 148 S.W. loc. cit. 205(3).

to the garage property, the nature of the alleged defect in title is not disclosed. Defendants insisted upon trial that their "title was good" and that they were "never in doubt about it"; and, from the record before us, we do not know whether defendants' title was merchantable and thus cannot determine whether the Olivers were justified in refusing to consummate the exchange of properties contemplated by the Oliver contract.

 Irrespective of that, George conceded upon trial that plaintiff's (in reality George's) commission for handling of the Oliver transaction "was to be deducted from Mr. Oliver"—"that was to be deducted from the (Oliver) farm purchase price"; and, the Oliver contract plainly provided that plaintiff's commission of $4,560 was "the balance of (the) purchase price" of $91,200 to be paid by defendants for the Oliver farm and that such commission was to be payable "within thirty days after the closing of this transaction." The question of when a broker becomes entitled to a commission depends upon his contract,[9] and certainly parties may, by contract, condition their liability for payment of a broker's commission upon prescribed events or contingencies.[10] In the instant case, plaintiff neither asserts nor could have any greater right to a commission than that given her by the Oliver contract, the provisions of which impel the conclusion that, since the Oliver transaction was not consummated and the purchase price of the Oliver farm was not paid (due to no demonstrated bad faith or fault on the part of defendants), plaintiff earned no commission on the Oliver transaction and the four Oliver notes were without consideration.

█ Furthermore, on a transcript disclosing that, within six months prior to February 17, 1953, when a real estate broker's license was issued to George, he acted as a broker [Section 339.010(1)] in connection with not less than eight transactions, of which at least four were consummated, we are not impressed by plaintiff's argument that, in respect to the Oliver transaction, the provisions of Chapter 339 were inapplicable to George as one "who might, *occasionally,* buy or offer to buy, or sell or offer to sell, * * * any real estate." Section 339.010(3). Since plaintiff, the payee in the $2,900 Oliver note, was not a holder in due course [Popovsky v. Griwach, 361 Mo. 1120, 238 S.W.2d 363, 365 (1); Gate City Nat. Bank v. Bunton, 316 Mo. 1338, 296 S.W. 375, 380(3); Long v. Mason, 273 Mo. 266, 200 S.W. 1062, 1065 (3)] and the note in her hands would have been subject to all of the defenses which might have been interposed if it had been payable to George and he had sued on it, we are of the opinion that plaintiff could not have maintained an action on the $2,900 Oliver note, which represented compensation claimed by George, then an unlicensed real estate broker, for services rendered in the buying, selling and exchanging of real estate. Section 339.160. But, it does not follow as a matter of course that defendants may recover the $2,209.86 paid on the $2,900 Oliver note, as they seek to do in their counterclaim.

 For, in the absence of fraud or duress, a payment, even of an illegal demand, voluntarily made with full knowledge of the facts cannot be recovered.[11] There is no suggestion of duress in the instant case, but defendants pleaded in their amended answer (*although not in their*

9. Wolcott v. Moser, 364 Mo. 443, 262 S.W. 2d 620, 625(4); Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453, 458.

10. Tant v. Gee, supra, 154 S.W.2d loc. cit. 747(3); Rosenblatt v. Multin, Mo.App., 222 S.W.2d 587, 592; Proctor v. Gentry, Mo.App., 214 S.W.2d 746, 748; Clarkson v. Standard Brass Mfg. Co., 237 Mo. App. 1018, 170 S.W.2d 407, 414(2–5); Wilson v. Rafter, 188 Mo.App. 356, 174 S.W. 137, 139; Hughes & Thurman v.

Dodd, 164 Mo.App. 454, 146 S.W. 446, 447(3).

11. Baldwin v. Scott County Milling Co., 343 Mo. 915, 122 S.W.2d 890, 895(6), reversed on another ground 307 U.S. 478, 59 S.Ct. 943, 83 L.Ed. 1409, rehearing denied 308 U.S. 631, 60 S.Ct. 65, 84 L.Ed. 526; Ferguson v. Butler County, 297 Mo. 20, 247 S.W. 795, 796(2), 26 A.L.R. 1519; American Brewing Co. v. City of St. Louis, 187 Mo. 367, 376, 86 S.W. 129,

*counterclaim)* that *either* George *"fraudulently* tendered and applied said ($2,209.86) check in payment of" the $2,900 Oliver note *or* payment of the $2,900 Oliver note "was the result of a *mutual mistake"* [12] on the part of George and O'Reilly, which, if established, necessarily would negative any idea that such payment was made voluntarily with full knowledge of the facts. And, in their brief on appeal, defendants argue "that the evidence conceivably shows that George * * * was *either* guilty of fraud in going in and getting the ($2,-900) Oliver note and representing that it was the Godfrey note, *or* that he (George) mistakenly picked up the wrong $2,900 note"; that it would have been "very easy for a mistake to (have been) made by both parties as to the note being paid"; and, that "it is immaterial whether the acts and conduct of George * * * in bringing out the wrong note was fraudulent or an innocent misrepresentation." Passing any question of pleading resulting from failure to charge either fraud or mistake in the counterclaim, the validity of defendants' argument depends, in the final analysis, upon acceptance of *defendants'* evidence that O'Reilly, intending to pay, the Godfrey note, did not enter Jarvis' place of business but waited outside, and that O'Reilly accepted the note (marked

"paid" by George upon his return) in the mistaken belief, induced by George's misrepresentation, that it was the Godfrey note when it actually was the $2,900 Oliver note. Certainly, *plaintiff's* evidence affords no foundation for a finding of either fraud or mutual mistake.

The testimony of the respective parties as to what occurred at Sikeston on February 4, 1953, was so patently hostile and utterly irreconcilable that the yawning chasm between their diametrically conflicting stories cannot be bridged with the charitable and superficial observation that some of the parties and their supporting witnesses simply were mistaken. Although our review is upon the law and the evidence as in suits of an equitable nature, such review must be with due regard to the opportunity of the trial court to judge of the credibility of the witnesses, and the judgment nisi will not be set aside unless it is clearly erroneous.[13] Appellate courts are fond of saying that deference should be accorded to the findings of the trial judge, whose advantageous position to resolve puzzling issues of fact and sharp questions of credibility was described graphically in classical and oft-quoted [14] language found in Creamer v. Bivert, 214 Mo. 473, 113 S.W. 1118, 1120;[15] and

131; Claflin v. McDonough, 33 Mo. 412, 415; R. S. Jacobs Banking Co. v. Federal Reserve Bank, Mo.App., 34 S.W.2d 173, 183(3); Columbia Building & Loan Ass'n v. Gill, Mo.App., 285 S.W. 181, 182(4); Pritchard v. People's Bank of Holcomb, 198 Mo.App. 597, 200 S.W. 665, 666(1).

12. Since defendants charge "a *mutual* mistake;" we do not discuss the right to recover on a *unilateral* mistake. Mathews v. City of Kansas, 80 Mo. 231, 235.

13. Section 510.310(4); Barker v. Allen, Mo., 273 S.W.2d 191, 192(2); City of Kirksville v. Young, Mo., 252 S.W.2d 286, 288(2); Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539, 542(1); Lowther v. Hays, Mo., 225 S.W.2d 708, 713(1); Stephenson v. Pfeiffer, Mo.App., 263 S.W.2d 218, 220(1).

14. Stokes v. Stokes, Mo.App., 222 S.W.2d 108, 111; Brooks v. Brooks, Mo.App., 211 S.W.2d 65, 68; Mistler v. Mistler, Mo.App., 202 S.W.2d 513, 515; Galst

v. Galst, Mo.App., 188 S.W.2d 843, 846; Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845, 847; Palakiko v. Harper, 9 Cir., 209 F.2d 75, 89–90 (ff. 17); Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 443; Yutterman v. Sternberg, 8 Cir., 86 F.2d 321, 324, 111 A.L.R. 736; United States v. Bucher, 8 Cir., 15 F.2d 783, 786.

15. "He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant

where, as here, there is blatant discord and irreconcilable conflict in the evidence on determinative issues of fact, resolution of which depends solely on the credibility of witnesses, application of the rule of deference becomes especially appropriate and necessary.[16]

 It may be conceded that it would have been more logical for defendants to have paid the Godfrey note on February 4, 1953, thus completing a transaction otherwise theretofore closed, than for them to have paid the $2,900 Oliver note when it was then doubtful whether the Oliver transaction would be consummated; but, in the welter of strange, peculiar, illogical and confusing circumstances in this case, many are noted (not here detailed that this opinion be not further prolonged) from which the able and experienced trial judge might well have concluded, as his findings of fact clearly show that he did, that plaintiff's evidence as to what occurred at Sikeston on February 4, 1953, should be accepted and that defendants' evidence on that subject was not worthy of belief. Having in mind also that, in the trial court, defendants had the burden of proving facts entitling them to recover on their counterclaim,[17] and that, on appeal, the presumption is that the decision of the trial court was correct and the burden is

on defendants-appellants to show affirmatively that reversible error was committed,[18] we are not persuaded that we can and should reach a contrary conclusion on the fundamental issues of fact and questions of credibility which are determinative of defendants' counterclaim. The judgment for plaintiff on defendants' counterclaim, not being clearly erroneous, is affirmed.

Concluding, as we have, that the four Oliver notes represented compensation unlawfully claimed by George, then an unlicensed real estate broker [Sections 339.020 and 339.160], and were wholly without consideration, it appears that defendants are entitled to a decree cancelling the three $553.33 notes, still unpaid and in plaintiff's hands.[19] Accordingly, the judgment for plaintiff on plaintiff's petition and on defendants' counterclaim is affirmed; but, the judgment for plaintiff on defendants' petition for equitable relief is set aside and the cause is remanded with directions to enter a decree for defendants enjoining transfer, directing surrender, and ordering cancellation of the three $553.33 Oliver notes.

McDOWELL, P. J., and RUARK, J., concur.

or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify."

16. State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S.W.2d 609, 615(8); Emer-

son v. Treadway, Mo.App., 270 S.W.2d 614, 624; Abbott v. Record, Mo.App., 233 S.W.2d 793, 796(2).

17. Pitts v. Ohio Oil Co., Mo.App., 161 S. W.2d 22, 24(3); 70 C.J.S., Payment, § 160 c, page 376.

18. James v. James, Mo., 248 S.W.2d 623, 627(8); Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73, 79; State to Use of Consolidated School Dist. No. 42 of Scott County v. Powell, 359 Mo. 321, 221 S.W.2d 508, 511(7).

19. Gammage v. Latham, Mo., 222 S.W. 469, 470(1); Henson v. Perry County Savings & Loan Ass'n, Mo.App., 300 S.W. 1037; Magee v. Pope, 234 Mo.App. 191, 112 S.W.2d 891, 900(6).